**BATH INDUSTRIES, INC., a Delaware Corporation, Plaintiff-Appellee,**

**v.**

**Emmet J. BLOT and Hambro American Bank & Trust Co., a New York Corporation, Defendant-Appellants,**

**and**

**Edward A. Merkle, Madison Fund, Inc., a Delaware Corporation, Mad International, Inc., a corporation, Richard E. McConnell, Donner Corporation, a Pennsylvania Corporation, Norton Penturn, Clark Estates, Inc., a corporation, X, Y and Z Investment Companies, and A, B and C Investment Banking and Brokerage Firms, Defendants.**

**Nos. 18044, 18097.**

United States Court of Appeals, Seventh Circuit.

May 20, 1970.

Rehearing Denied July 17, 1970.

---

Victor M. Harding, Laurence C. Hammond, Jr., Maxwell H. Herriott, Milkaukee, Wis., for defendants-appellants.

David E. Beckwith, Milwaukee, Wis., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, Circuit Judge.

HASTINGS, Senior Circuit Judge.

This is an appeal from an order of the district court granting plaintiff's motion for a preliminary injunction enjoining appellants and other defendants, as well as "all persons controlled by them or in active concert with them," from "proceeding with their plan (including, but not limited to removing the chief executive officer of [plaintiff] Bath and calling for a special shareholders' meeting) until they have complied with Section 13(d) of the 1934 [Securities Exchange] Act." The injunction is to remain in effect until it is determined that defendants have filed legally sufficient statements pursuant to Section 13(d).

 Section 13(d), 13(e), 14(d), 14(e) and 14(f) were added to the 1934 Act by a 1968 amendment, the Williams Act. In general, the last four named subsections deal with acquisitions of stock by the issuer and with those by tender offers. Section 13(d) [1] deals with

1. Section 13(d), 15 U.S.C.A. § 78m(d), provides in relevant part:

"(d) (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title * * *, is directly or indirectly the beneficial owner of more than 10 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases * * *;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals * * * to make any * * * major

change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer * * *.

* * * * *

"(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection.

"(4) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

* * * * *

"(5) The provisions of this subsection shall not apply to—

* * * * *

acquisitions of stock by substantial stockholders and is the only section of the Williams Act involved in the present appeal. The legislative history shows that the purpose of the Williams Act was to close a gap in the disclosure requirements of existing securities laws by requiring full disclosure by persons or groups who "purchase by direct acquisition or by tender offers * * * substantial blocks of the securities of publicly held companies." 113 Cong.Rec. 24664 (1967). Senator Harrison A. Williams, Jr., of New Jersey, stated the purpose of his bill to be "to require the disclosure of pertinent information * * * when a person or group of persons seek to acquire a substantial block of equity securities of a corporation by a cash tender offer or through the open market or privately negotiated purchases * * *." *Id.*

Broadly stated, under new Section 13 (d) (1), any person who, after acquiring the beneficial ownership of an equity security of an issuer, is the owner of more than 10% of the outstanding amount of such security, must file statements with the SEC, the issuer and stock exchanges disclosing specified information. Section 13(d) (3) defines "person" as used in Section 13(d) (1) to include any "group" acting "for the purpose of acquiring, holding, or disposing of securities of an issuer." Section 13(d) (5) exempts from the application of Section 13(d) acquisitions which do not amount to 2% of the security outstanding within a twelve month period.

In the most simplified form, the issues for our review are when do a number of stockholders of a corporation become a "group" within the meaning of the Williams Act and when must such group comply with the filing and notification provisions of that Act. Also involved is the propriety of the preliminary injunction entered by the trial court.

Only two other courts of appeal have dealt with the Williams Act. Neither touched the issues now before us. In Electronic Specialty Co. v. International Controls Corp., 2 Cir., 409 F.2d 937 (1969), the Second Circuit dealt with new Section 14(d) and chiefly with issues of the adequacy rather than the timing of compliance. In Susquehanna Corp. v. Pan American Sulfur Co., 5 Cir., 423 F.2d 1075 (1970), the Fifth Circuit did deal with new Section 13(d), which is before us, but again the primary issue was the adequacy of the compliance. Thus the issues raised on this appeal are said to be of first impression.

Plaintiff Bath Industries, Inc. (Bath) is a Delaware corporation with its principal place of business in Milwaukee, Wisconsin. Bath was organized as a holding company in 1967. Its Milwaukee office consists of a small staff including its president and chief executive officer, William D. Kyle, Jr. (Kyle), its executive vice president, Robert R. Greenwalt, and other personnel whose function it is to furnish overall policy, planning, financial, operating and legal guidance to Bath's subsidiaries.

Bath has three wholly-owned subsidiaries. Bath Iron Works Corporation (BIW), located in Bath, Maine, has been engaged in shipbuilding for over 70 years. Since about 1935 its principal business has been the construction of destroyers for the United States Navy. Ninety-five percent of its current business is with the Navy. Congoleum Industries, Inc. (Congoleum) was acquired by Bath in 1968. It is engaged in the manufacture of floor coverings, household furnishings and related products. It has seventeen plants located in New Jersey and throughout the country. Pennsylvania Crusher Corporation manufactures and sells gyratory crushers, impacters and other equipment.

Nine named defendants were made parties to the original complaint. Three

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class * * *."

of these were dismissed without prejudice after they signed a settlement agreement with Bath. Three others have indicated a desire to be similarly treated, but have been denied dismissal pending a later determination of the validity of the settlement agreements by the trial court.[2] Two of the original defendants join in this appeal.

Defendant-appellant Emmet J. Blot (Blot) is the president and sole owner of Godolphin, Inc. Blot and Godolphin operate as financial consultants. Blot is a shareholder of Bath. Since April, 1966, he has been a director of Bath[3] and served as chairman of its executive committee from April, 1967 to April, 1969.

Defendant-appellant Hambro American Bank & Trust Co. (Hambro American) is a New York banking corporation. It is owned by a Delaware holding company, Eurus, Inc. Eurus, Inc., is, in turn, owned fifty per cent by Hambros Bank, Ltd. (Hambros), a London, England investment banking corporation, and fifty per cent by approximately twenty-five American stockholders, including Blot who has been a director of Eurus, Inc., since August, 1969. Hambros is a stockholder of Bath and, while not a defendant, is named in the preliminary injunction.

Defendant Edward A. Merkle (Merkle) is president of defendant Madison Fund, Inc., and a stockholder of Bath. Merkle was dismissed by stipulation in the trial court.

Defendant Madison Fund, Inc. (Madison) in a Delaware registered, closed end investment company located in New York City. It is a stockholder of Bath. Madison was dismissed by stipulation in the trial court.

Defendant MAD International, Inc. (MAD) is a foreign investment corporation with offices in Switzerland and New York. It is associated with defendant Madison and is a stockholder of Bath. MAD was dismissed by stipulation in the trial court.

Defendant Richard E. McConnell (McConnell) is vice president of defendant Donner Corporation. The record does not show that McConnell is a stockholder of Bath. Bath sought to dismiss McConnell by stipulation in the trial court pursuant to a signed settlement agreement, but the court refused to so order.

Defendant Donner Corporation (Donner) is a Pennsylvania corporation which acts as the investing agent and nominee for the William H. Donner family. It holds warrants to purchase Bath stock. Bath sought to dismiss Donner by stipulation in the trial court pursuant to a signed settlement agreement, but the court refused to so order.

Defendant Clark Estates, Inc. (Clark Estates) is a New York corporation. Although it owns no Bath stock, the trial court found that it provides investment advice and related services to a number of accounts owning Bath shares and in most instances determines how those shares will be voted. In the trial court, Clark Estates expressed a desire to enter into a settlement agreement with Bath. However, the court refused to permit the execution of such agreement and none was ever consummated. Clark Estates did not appeal, but we granted leave to its attorney to present a brief oral argument on its behalf in this appeal.

Defendant Norton Penturn (Penturn) is a Bath stockholder residing in Toronto, Ontario, Canada. He was not dismissed in the trial court but did not join in this appeal.

Also named as defendants were presently unknown X, Y and Z Investment

---

2. This issue is not before us on this appeal, and we express no opinion concerning the propriety of the settlement agreements.

3. On April 6, 1970, the day set for oral argument of this appeal, the court was advised that Blot has resigned as a director of Bath and of BIW and that his resignation was accepted by the Bath board of directors on March 31, 1970. This resignation does not affect our consideration of the issues presented on this appeal.

Companies and A, B and C Investment Banking and Brokerage Firms.

The district court held that plaintiff Bath had demonstrated a likelihood that it would ultimately prevail in its attempt to show that defendants had violated the Williams Act. It concluded that defendants and certain others constituted a "group" which had acted together for the purpose of acquiring or holding Bath securities, as that term is defined in Section 13(d) (3), *supra*, of the Williams Act. Such group, the court found, owned beneficially, directly or indirectly, more than 10% of Bath's stock, a precondition to the disclosure requirements of the Act. The court further concluded that the members of the group had agreed to pool their voting interests in Bath securities and to act in concert to carry out a plan to take control of Bath by replacing Kyle as its chief executive officer and by increasing the size of its board of directors. The court also found that some members of the group had acquired additional Bath stock to insure the success of their plan.

The court construed the Williams Act to require the "group" to comply with its disclosure provisions "within ten days after the group * * * agreed to act together * * *." Finding that the required Schedule 13D had not been filed with the SEC nor sent to Bath and the securities exchanges on which its stock is traded, the court concluded that the group had violated the Act. Finally, the court found that unless enjoined from carrying out its plan, the group would cause Bath permanent and irreparable harm in that the group contemplated a strongly contested proxy fight to achieve its goals. Such a proxy fight, the court found, would probably severely limit BIW's chances to obtain a large contract for which it had been actively contending and on which its future might depend.

This so-called "DX Contract" and matters related to it have become significant in this case. In 1967, BIW became engaged in competition with five other firms for the DX Contract, which may be the largest shipbuilding contract ever awarded by the United States Navy. As many as 100 destroyers eventually may be built under this contract over the next ten years. Billions of dollars are said to be involved. The only two firms remaining in competition for the proposed contract are BIW and Litton Industries. The DX Contract was originally scheduled to be awarded on November 18, 1969. The award has been delayed a number of times and its timing is now uncertain. Should BIW succeed in winning the contract, it would require a substantial amount of new capital, it would construct an entirely new shipyard and it would more than double its current number of employees.

Much has been said concerning Blot's feelings about the DX Contract. Bath charges that he has always opposed it and was not concerned if Bath lost it. However, the record shows that with one exception Blot voted for pursuing the competition each time it came before the board. The one exception was an abstention when the matter was first considered. Here, however, the record shows no more than an honest and not unfounded reservation about getting into a costly competition for a contract with little hope of success in winning it. As soon as Blot learned that Bath had been able to secure an outstanding naval architect and the necessary financial strength through the Congoleum acquisition, he consistently voted to continue the competition for the contract. In fact, when this litigation began to generate publicity adverse to Bath's chances for the contract, Blot was quick to communicate with the Navy and with members of Congress assuring them of his belief that Bath should get the contract.

Bath further charges that Blot exhibited his opposition to the contract by opposing a financing plan which was necessary if Bath was to get the contract. However, it appears from the record that this "opposition" was no more than an attempt to secure a better financing plan and that similar "opposition" was voiced by a number of the Bath directors, in-

cluding Kyle and those who have supported him most strongly.

We may now turn to the series of events which led to the present litigation. Blot and Roger D. Lapham, another Bath director who has appeared in this litigation on behalf of Bath, had been associated in an investment partnership since about 1961. This association was terminated in the fall of 1968. While associated, Blot and Lapham had on several occasions acquired substantial blocks of stock in various corporations with the intent of gaining control. They were assisted in these efforts by Hambros. Blot has apparently been advising Hambros on its American investments for some time.

In February, 1966, Blot and Lapham heard of a large block of BIW stock for sale by a firm in Philadelphia. The total available was over 80,000 of the then outstanding 400,000 BIW shares. They were unable to buy this whole amount, but with the aid of Hambros bought about half of it. The other half was purchased by Kyle and an associate of his, John O'Boyle, who were both directors of BIW at the time. This purchase gave Kyle and O'Boyle each about 9% of the outstanding BIW shares. Shortly after these February purchases, Blot and Lapham were elected to the BIW board. In 1967, when BIW was reorganized and Bath formed, Kyle, with Blot's support, became chairman of BIW and president of Bath.

As early as July, 1968, Blot spoke to a director of Hambros, John Clay, concerning his own belief that Kyle should be replaced as the chief executive officer of Bath. In August, 1968 he told Kyle of his view that now that Bath was purely a holding company and taking on a national scope, it should be headed by a "professional chief executive officer." Blot, also during August, presented these views to the Bath board and further expressed his opinion that the offices of the holding company should be moved from Milwaukee to New York. Blot was supported in these proposals by only one other of the thirteen Bath directors,

Milton V. Freeman, an attorney who had on occasion represented Blot in his private affairs.

Some time prior to April, 1969, McConnell and Merkle indicated to Blot that they or the funds they managed might be interested in buying Kyle's Bath stock. Blot asked Lapham to arrange a meeting between Kyle and these men. Blot testified that he did not discuss with McConnell and Merkle his belief that if Kyle sold his stock in Bath, he would resign as its president. He said he assumed that this result would obviously follow and that it would be for the good of the corporation. In affidavits, both Lapham and Kyle stated that among the reasons given by Blot for wanting the meeting was to *secure control* of the corporation through the purchase of Kyle's stock. However, both also testified at the hearing that they understood the purpose of the meeting to be merely to give Merkle and McConnell an opportunity to present a proposal to buy Kyle's stock.

Lapham arranged a meeting in New York City for April 14, 1969. The meeting was attended by Merkle, McConnell, Blot, Kyle, Lapham, Robert R. Greenwalt, Bath's executive vice president and a member of the board, Richard Harrington, Bath's general counsel and a member of the board, and William Witter, a broker. No definite proposal for the purchase of Kyle's stock was made. Rather, the discussion centered around Merkle and McConnell's belief that Bath should "spin off" its shipbuilding operation since both the shipbuilding operation and the home furnishing business would be more attractive to investors if they were not tied together. Both Lapham and Kyle indicated that most of the talking was done by Merkle and Kyle. Kyle, however, did believe that Blot suggested that he, Merkle and McConnell were acting together to purchase the Kyle stock.

In early July, 1969 Blot again spoke to John Clay of Hambros about replacing Kyle and indicated that he thought they should look for a replacement of out-

standing reputation. At the July 15 meeting of the Bath board the question of replacing Kyle was again discussed and the board apparently opposed the idea at that time.

At some point before the end of August, Blot claimed that he obtained from Orville Beal, former president of the *Prudential Life Insurance Company*, his consent to become Bath's chief executive.[4] He also claimed the consent of Roger Blough, former chairman of United States Steel Corporation, and Frederick Atkinson to serve on the Bath board if Beal became the chief executive. During this period Blot communicated with Clay, Merkle, McConnell and Penturn concerning his proposed replacement for Kyle.

During August, Penturn spoke to Richard Clarkson and Michael A. Nicolais, both of Clark Estates, concerning his dissatisfaction with Kyle. On September 4, 1969, Clarkson and Nicolais met with Merkle at the latter's invitation. Merkle told them of his dissatisfaction with Kyle and of his plan to try to effect a change of top management. Clarkson and Nicolais indicated that they, too, had become dissatisfied with Kyle and that if Merkle ever got to the point where a management change was to be made, they would support such a move.

About this same time, Lapham heard indirectly that Merkle and Blot's attorney had been soliciting the support of American Express (which operates a number of mutual funds) to oust Kyle.

A meeting between Lapham and Clay was arranged for September 10, 1969, at Lapham's request. It is quite apparent that this was a part of his continuing effort to prevent Blot from succeeding in his plan to replace Kyle. By mutual agreement, Blot, Merkle, Kyle and Harrington were also invited. At the meeting Merkle produced a list of various Bath stockholders prepared by Blot showing the votes allegedly controlled by

them. The list accounts for nearly 50% of the outstanding Bath stock. Lapham and Kyle's account of the meeting makes repeated references to Merkle's alleged statements that these stockholders had joined together and agreed to vote their stock as a group to obtain control. Merkle allegedly told Kyle that he should just go away quietly and let Beal take over because they had solid control of the company and would vote him out if he did not resign. It is also alleged that reference was made to recent and extensive purchases of Bath stock by the members of the group.

Blot's account is completely different. While admitting that Merkle was unnecessarily rude, Blot denies that he said anything about the group having agreed to vote together to oust management and seize control. Rather, he claims that the list was presented to Kyle to show him that a substantial number of shareholders had expressed a desire to see Beal replace Kyle. It was hoped Kyle would then bow to the wishes of the stockholders. At the conclusion of the meeting, Kyle left indicating that he thought a change in top management would hurt Bath in the DX Contract competition and that he wanted to verify the list of stockholders and did not intend "to roll over and play dead."

On September 12, 1969, Blot and Freeman wrote to Bath's secretary and to Kyle demanding a stockholders list and the calling of a special *stockholders'* meeting for November 17, 1969, for the purposes of increasing the Bath board from 13 to 23, electing 10 new directors, changing the quorum requirement, and making it impossible for the board to thereafter create new directorships without stockholder consent. On the same day Blot began hiring a team of proxy-fight specialists.

On September 16, 1969, the Bath board met. Blot produced the same stockholder list that Kyle had been shown on Septem-

4. A cited news article in the September 30, 1969 edition of The Wall Street Journal quotes Mr. Beal as saying that it was his understanding that he had been proposed only as chairman of Bath and that he did not know he "was also proposed as chief executive officer."

ber 10. Kyle again claims that Blot spoke of his group having control and wanting Kyle removed. It is at least clear that Blot and Freeman suggested that the board elect Orville Beal to replace Kyle and add Beal, Blough and Atkinson as new directors. They further advised the board that if these steps were not taken, they would press for the special stockholders' meeting on November 17, 1969, in order to let the stockholders decide the issue. Kyle and another director claim, while Blot and Freeman deny, that a number of the directors protested the timing of the proposed meeting on the day immediately preceding the date scheduled for awarding the DX Contract. Blot and Freeman maintain that the date was set by chance by their attorneys solely on the basis of filing schedules required by the SEC. After some discussion, the meeting was recessed until September 29 in order to permit everyone to meet Beal and to attempt some accommodation. Blot and Freeman then amended their request for a special stockholders' meeting, changing the date from November 17 to December 2, 1969.

On Sunday, September 28, 1969, the Bath board met without Blot and Freeman and agreed to commence the instant litigation. This action was filed the following day.

Bath attempted to prove that Hambros and many of the defendants were purchasing Bath stock between the beginning of April, 1969 and the end of September, 1969, while the events just set out were taking place.

It is not disputed that Blot himself bought no equity securities of Bath during 1969 and in fact sold both common and preferred during April and May.

Blot testified that he did not inform Hambros of these sales.

A comparison of Merkle's holdings of record on Bath's books on March 31, 1969 and October 2, 1969 shows an increase of 1000 shares.[5] Blot denied knowledge of these acquisitions.

A similar comparison of Madison's holdings of record shows an increase of 184,566 shares. Blot also denied knowledge of these acquisitions.

The same comparison for Donner shows no change.

The same comparison of Penturn's holdings of record and with a nominee, Laidlaw & Co., shows a decrease of 17,700 shares in his holdings. However, a comparison of his March 31 holdings with the holdings claimed for him on the Blot-Merkle stockholders list shows an increase of 32,294 shares. Furthermore, Penturn admits that during July, 1969 he purchased $242,500 worth of Bath common and $367,000 worth of its preferred. The latter purchase was financed by a loan from Hambros.

Purchases by the Hambros group are somewhat more difficult to demonstrate. Bath attempts to do this by comparing the holdings of record of Daly & Co., which it showed to be a nominee for, and for only, Hambro American and its accounts, including Hambros and various of its subsidiaries. This comparison shows an increase in Daly & Co. holdings of 159,199 shares between March 31 and October 2. That figure would be somewhat higher if the Hambro American figure on the Blot-Merkle list were used. This comparison has a weakness in that an increase in the holdings of a nominee does not necessarily reflect acquisitions by the true owner. For example, it could simply reflect a transfer from one nom-

5. The comparison of Merkle's holdings and those of other stockholders immediately following, reflect an adjustment for a stock split on August 29, 1969, and where applicable, a further adjustment required by Regulation 13d–3, 17 C.F.R. 240.13d–3, which provides that a "person shall be deemed to be the *beneficial own-* er of securities of such class which such person has the right to acquire through the exercise of presently exercisable options, *warrants* or rights or through the conversion of *presently convertible securities,* or otherwise * * *." (Emphasis added.)

inee to another by the owner. However, Bath, by comparing various records, was able to give some assurance that the increase in Daly & Co. holdings reflected with approximate accuracy new acquisitions by Hambro American accounts. Bath further showed that Hambros Investment Co. purchased 10,700 warrants for Bath common in June, 1969. Hambros Bank, Ltd., admits that it purchased $1,390,000 worth of Bath common and $555,000 worth of Bath preferred in July, 1969. It denies that any account advised by it purchased Bath securities during 1969. Blot testified that he knew Hambros was buying Bath stock after July 1, 1969. Kyle testified that Clay told him Hambros had been buying substantial amounts of Bath stock in the weeks or months prior to the September 10 meeting.

Finally, a comparison of the holdings of Clark Estates' nominee, J. C. Orr & Co., shows an increase of 106,018 shares between March 31 and October 2. Clark Estates admits that between July 16 and July 18, 1969, it purchased, for various advisee accounts, 39,600 shares of Bath preferred at a cost of $1,700,000.[6]

Bath further contends that many of these purchases occurred between July 16 and July 18, immediately following the July 15 Bath board meeting at which the board failed to adopt Blot's proposal to replace Kyle. Those three days were shown to have been the heaviest trading days in the history of Bath stock. The total volume was 172,700 shares of common and 89,200 shares of preferred. In addition to the admitted purchases of Clark Estates in those days, Bath claims that much of the activity could be traced to Daly & Co., the Hambro American nominee. The evidence here is that 89,-400 shares of Bath common were transferred into Daly & Co. in September. Bath's expert testified that he knew

which specific fund these shares were transferred from and that he knew that that fund was still holding the shares as of June 30, 1969. Thus he concluded that a substantial number of the shares traded on July 16, 17 and 18 came to rest ultimately with Daly & Co. He admitted, however, that he could not tell from the transfer sheet of Daly & Co. when the transaction giving rise to the transfer actually took place. It should also be noted here that Kyle himself was buying both Bath preferred and common rather heavily on these days.

## I

Since it is conceded that no individual defendant owns 10% of the outstanding stock of Bath and since the disclosure provisions of the Williams Act come into play only when a person or group beneficially owns more than 10% of the relevant class of a corporation's shares, we must first determine whether the district court correctly concluded that the defendants should be treated as a "group" within the meaning of the Act.

The Act, in Section 13(d) (3), provides:

"When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

Bath contends that the effect of reading this provision into Section 13(d) (1) is to require the defendants, who together own beneficially the required 10% of Bath's stock, to comply with the Act's disclosure provisions within 10 days of the time they agreed to act in concert toward any goal, whether or not any defendant purchased additional Bath stock in furtherance of that goal. Bath cites

---

6. It should be noted that Bath adduced no proof that would link Clark Estates to the alleged group prior to August, 1969, after these admitted purchases. Clark Estates denies that it has advised any of its accounts to buy or sell Bath stock since the August and September meetings which Bath relies upon to show it was a member of the alleged group.

the following passage from the House Report:

"[Section 13(d) (3)] would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. *The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert.* Consequently, *the group would be required to file the information called for in section 13(d) (1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time.* This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership of securities by reason of any contract, understanding, relationship, agreement or other arrangement." House Rep. No. 1711, 90th Cong., 2d Sess., July 12, 1968, pp. 8–9, 1968 U.S.Code Cong. & Ad.News, pp. 2811, 2818. (Emphasis added.)

Defendant-appellants, on the other hand, cite numerous passages from the legislative history for the proposition that "the Act was directed towards *purchases* of stock, either by tender offer or otherwise, and not simply concerted action among existing stockholders." They also stress the language of Section 13(d) (1) which says, "Any person who, *after acquiring* * * * beneficial ownership of any equity security * * * is * * * the beneficial owner of more than 10 per centum of such [security] * * *." They contend that to require Williams Act disclosure on the terms advanced by Bath would discourage and impede existing shareholders in the exercise of their right to stand united against decisions of, and, if necessary, to replace the management which is supposedly working for them.

■ Any interpretation of this Act must honor the whole Congressional in-

tent and should avoid exclusive reliance on either the passages stressed by Bath or those stressed by defendant-appellants. Our review of the legislative history convinces us that the overriding purpose of Congress in enacting this legislation was *to protect the individual investor* when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed. In the words of Senator Williams: "[The bill] is designed solely to require full and fair disclosure for the benefit of investors." 113 Cong.Rec. 24664 (1967). *See also* Electronic Specialty Co. v. International Controls Corp., 2 Cir., 409 F.2d 937, 945 (1969). The protected class of investors includes investors in general as well as the stockholders of the specific corporation involved. 114 Cong.Rec. 21954.

Senator Williams stated that in seeking to achieve this investor protection "extreme care [was taken] to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids. * * * The bill will * * * provide the offeror and management equal opportunity to present their case." 113 Cong.Rec. 24664 (1967). *See also* House Rep.No.1711, 90th Cong., 2d Sess., July 12, 1968, 1968 U.S.Code Cong. & Ad.News 2811, and *Electronic Specialty, supra,* 409 F.2d at 948.

■ Having all of these aspects of the legislative intent in mind, it is our conclusion that the Act should be interpreted to require compliance with its disclosure provisions when, but only when, any group of stockholders owning more than 10% of the outstanding shares of the corporation agree to act in concert *to acquire additional shares.*

■ This construction focuses on the decision on the part of a group owning more than 10% of a corporation to acquire more shares. Thus it honors the repeated expressions of legislative intent to draft a statute to protect investors rather than to protect current manage-

ment. It does not proscribe informal discussion among existing shareholders concerning the performance of current management. Nor does it proscribe legitimate cooperation among existing shareholders to assert their determination to take over control of management, *absent* an intention to acquire additional shares for the furtherance of such purpose.

■ However, when such a group of existing shareholders reaches the point where it decides to buy additional stock to reinforce its position against management, full disclosure for the benefit and protection of other stockholders and investors will be required. The clear purpose of the legislation is to protect these stockholders and investors, and it is at this point that the need for the Act's protection becomes critical. Thus it follows that once the group *agrees* to act in concert *to acquire shares,* its members must comply with the Act's disclosure requirements whether or not any one of them has at that time acquired stock in furtherance of the underlying plan. *See* House Rep.No.1711, *supra.*

## II

■ Apart from the unlikely execution of a formal agreement by a group to acquire additional shares in support of its objectives, proof of such an agreement to acquire would be difficult for anyone not privy to the group's plan. The establishment of such purpose should not be permitted to raise an insuperable barrier to a reasonable construction of the Act in carrying out the evident Congressional intent. Hence, we have concluded that once it is shown that such a group has agreed to pursue a common objective, and once it is further shown that a member of the group has *thereafter* purchased additional shares of the corporation's stock, then a *rebuttable presumption* arises that such purchase was made pursuant to an agreement of the group as of that date to acquire shares in furtherance of its objectives. Compliance with the Act's disclosure provisions would be required within ten days of such purchase.

## III

Both parties have discussed the relationship between the Williams Act disclosure requirements and the proxy regulations which require a person to file with the SEC, for its approval, certain specified material before he may solicit proxies to vote corporate shares. 17 C.F.R. § 240.14a-1, et seq. Under an exemption granted by Regulation 14a-2(a), 17 C.F.R. § 240.14a-2(a), compliance with the proxy regulations is excused if less than ten persons are solicited.

Defendant-appellants contend that this exemption provision "recognizes the need to balance the inherent advantages which incumbent management has in a proxy contest by affording the insurgents a degree of flexibility in making their preliminary soundings of strength with other stockholders." They urge that any requirement of a filing under the Williams Act before ten shareholders are solicited and before any purchases are made would be inconsistent with the exemption provision of the proxy regulations.

■ The Williams Act is clearly related to the proxy provisions and should be construed to operate in harmony with them. *See* 113 Cong.Rec. 24665 (1967) and *Electronic Specialty, supra,* 409 F.2d at 945 and 948. The construction we have adopted recognizes this need to maintain a rational consistency between these two types of disclosure provisions.

We have already pointed out the right of existing stockholders to assess the scope of available support on matters of legitimate concern to them. This we would limit only by bringing into play the Williams Act disclosure provisions at such time and under such circumstances as hereinabove set out.

We find little merit in other contentions raised concerning the proxy regulations. There is no showing that Congress intended to limit disclosures under the Williams Act to those already required by the proxy regulations.

### IV

We come then to an application of Section 13(d) (3) to the facts of the instant case. In this respect, our scope of review is limited. It is fundamental that a trial court has broad discretion in issuing or withholding an injunction and that its exercise of such discretion is not subject to review except upon a showing of clear abuse. Beneficial Finance Co. of Wisconsin v. Wirtz, 7 Cir., 346 F.2d 340, 344 (1965). This is particularly so when, as here, a preliminary injunction is issued merely for the purpose of preserving the *status quo* pending a determination of the action on the merits. Tanner Motor Livery, Ltd. v. Avis, Inc., 9 Cir., 316 F.2d 804, 808 (1963). In such case it is not necessary that the trial court find the certainty of a wrong, a likelihood is sufficient. United States v. Ingersoll-Rand Co., 3 Cir., 320 F.2d 509, 524 (1963). Nor do we at this juncture review the case in its entirety on the merits. Tatum v. Blackstock, 5 Cir., 319 F.2d 397, 401 (1963). Thus, it will suffice if we find in the record sufficient evidence to indicate that the trial court's conclusion concerning the formation of a Williams Act group was based on findings of fact which are not clearly erroneous.

The trial court found that the defendants, other than Clark Estates, together with Hambros had combined in support of the common objective of removing Kyle sometime between the April 14, 1969 meeting and midsummer of that year.

We are not prepared to say that this finding is clearly erroneous. There is evidence that by July, 1969 Blot had talked with Clay of Hambros at least twice about replacing Kyle. By that time, he had tried to arrange for Merkle and McConnell to buy Kyle's stock in Bath. There was testimony that they knew why he wanted Kyle to sell. Further, Blot admitted that sometime near the middle of the summer he arrived at his agreement with Beal and communicated this to Clay, Merkle, McConnell and Penturn.

It may be that when the parties have a further opportunity to develop the facts before the district court, they will be able to determine with more certainty when these various events took place and how the relationship of the parties progressed as the summer passed. However, at this point, all we need say, and all we do say, is that the finding of the district court, for the purpose of determining the likelihood of a violation, that the defendants had combined in their opposition to Kyle by midsummer, 1969, is not clearly erroneous.

The second critical fact which must be found to support the district court's conclusion is that the defendants, after combining in support of the common objective of removing Kyle, agreed to acquire additional Bath stock in furtherance of this concerted opposition. While there is little or no direct evidence of such an agreement in the instant case, there is evidence which could have justified the district court in concluding that various members of the group purchased Bath stock after combining in opposition to Kyle but before September 30, 1969. This raises a rebuttable presumption that an agreement to acquire was entered into some time prior to September 30. Since no Schedule 13D was filed until October 22, 1969, this is sufficient specificity to support the conclusion that there is a likelihood that defendants have violated the Williams Act. More exactness may become necessary to determine the certainty of a violation or to fashion an appropriate remedy,[7] but it is not nec-

---

7. It may be, for example, that an appropriate remedy for a violation of the Williams Act could involve disenfranchisement or divestiture of *shares acquired after the violation*. Since the group apparently has no duty to disclose until 10 days after it becomes a Williams Act group and since Section 13(d) (5) may exempt certain of its purchases after it might otherwise be required to comply with the Act, the fixing of a date of formation of the group with some exactness may be one problem to be faced by the parties and the court on remand.

essary for purposes of our review of this preliminary injunction.

## V

Thus far it has been assumed that all the defendants and Hambros are "beneficial owners" of Bath securities within the meaning of the Williams Act. Defendant-appellants contend that neither Hambros nor Clark Estates could possibly be members of a Williams Act group since neither is the beneficial owner of any Bath stock. They contend that the district court erred in construing the term "beneficial owner" in the Act to include any person who has the right to determine how shares are to be voted, whether or not such person has any other incidents of ownership.

The court noted that the House Report on the Act referred to the pooling of "voting or other interests," and then continued: "Thus it is clear from the House Report that one who has the right to determine how the stock is voted has a beneficial interest for the purposes of this Act. Moreover, the basic regulatory thrust of the Act is in the context of struggles for corporate control, and voting control of stock is the only relevant element of beneficial ownership in that context." We agree.

In the context of a contest for control, both the insurgents and management are interested in the control of votes. If a mutual fund, bank, trustee, broker or anyone else can guarantee a block of *votes*, the legal title to such shares would appear irrelevant. So far as the actual practice is concerned, Freeman, Lapham and an expert for Bath all testified that the usual practice is for an account to permit the investment bank that advised it to buy the stock to vote the stock. Thus, we conclude the district court properly found that, for the purposes of the Williams Act, Hambros and Clark Estates are the beneficial owners of Bath shares which they have the right to vote.

Defendant-appellants further contend that Hambro American could not possibly be a member of a Williams Act group since it is precluded by state law, New York Banking Law, McKinney's Consol.Laws, c. 2, § 97, from owning equity securities. However, it is undisputed that Hambros owns Bath shares. It is further undisputed that Hambros has one or more accounts with Hambro American and that Hambro American holds, by its nominee Daly & Co., Hambros' Bath shares. We cannot say that, under these circumstances, it was an abuse of discretion for the trial court to extend the coverage of the preliminary injunction to include Hambro American, in view of the possibility that it has effective power to control the votes of some or all of the shares held in Hambros' accounts with it.

## VI

Defendant-appellants contend that even if, as we have found, the district court had a basis for finding a probable violation of the Williams Act, still the issuance of the preliminary injunction was improper. First, they assert that the principal harm found by the district court and asserted by Bath is the possible loss of the DX Contract due to a bitter proxy fight on the eve of its award. This, they say, is no harm at all since there is no assurance that the Navy would not award the contract to BIW, even with new management, or that the contract if awarded, would be profitable for BIW and its parent, Bath.

We find little merit in these contentions. It appears quite probable from the heated competition for the DX Contract that the major shipbuilders in the country view it as a profitable prize for the ultimate winner. We are not prepared to say that the district court should have found otherwise. Nor are we willing to say the court erred in finding that it is "very likely" that Bath would suffer irreparable harm through the loss of the DX Contract due to the probable reluctance of the Navy to deal with *any* Bath management during or after a divisive and energy-consuming battle for control.

Defendant-appellants further assert that this harm in no way flows from the alleged violation of the Williams Act since compliance with the Act would have resulted in the disclosure of the rift in Bath's management. However, the district court could have properly concluded that the adverse effects on Bath's position in the DX competition of a timely Williams Act disclosure would have been significantly less than the adverse effects of a disclosure coming after this action was filed and after the defendants had already acquired sufficient Bath stock to make the change in management a near certainty. Thus, we cannot say that the court erred in finding that irreparable harm would be done to Bath and its stockholders unless defendants were enjoined from now proceeding with their plan after having allegedly violated the Williams Act in keeping it secret until this late date.

## VII

Defendant-appellants also contend that the preliminary injunction granted was overly broad. The court enjoined defendants and persons controlled by them or in active concert with them "from proceeding with their plan (including, but not limited to removing the chief executive officer of Bath and calling for a special shareholders' meeting) until [it is determined that] they have complied with section 13(d) of the 1934 Act." Defendant-appellants contend that no more should be required than that they file 13D Schedules. Thereafter, they say, plaintiff may, if it wishes, challenge the sufficiency of such filing. Defendant-appellant Blot has already filed a 13D Schedule. Plaintiff asserts that such filing, after the commencement of this suit, comes too late and is, in any event, plainly inadequate on its face.

The discretion of a district court to fashion remedies in this area is broad. In J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423

(1964), the Supreme Court found it "well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use *any available remedy* to make good the wrong done." (Emphasis added.) In Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), involving violations of the Sherman Act, the Court "start[ed] from the premise that an injunction against future violations is not adequate to protect the public interest. If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact * * *." Such a premise is equally applicable to the instant case.

If defendant-appellants were in fact required to file statements pursuant to the Williams Act sometime near midsummer of 1969, the filing of 13D Schedules in October, 1969 may well be insufficient to cure the failure to file earlier. The purpose of the filing and notification provisions is to give investors and stockholders the opportunity to assess the insurgents' plans *before* selling or buying stock in the corporation. It additionally gives them the opportunity to hear from incumbent management on the merit or lack of merit of the insurgents' proposals. If the defendant-appellant's late filing is sufficient, then no insurgent group will ever file until news of their existence and plan leaks out and prompts a law suit. By that time it will be too late to avoid the evils which the Williams Act is designed to eliminate. Thus, we do not find that the district court erred in the scope of this preliminary injunction. It may be that upon a final adjudication of the merits some broader or narrower remedy will recommend itself to the discretion of the court. However, we deal only with a temporary remedy designed to preserve the *status quo* and we find the preliminary injunction not inappropriate to that end.[8]

8. It should be pointed out that as this litigation continued to consume time after the court below acted, the time for the annual meeting of the Bath stockholders approached. Since the preliminary injunction effectively disenfran-

**114**

### VIII

Finally, defendant-appellants contend that the issuance of the preliminary injunction was improper because the court lacked personal jurisdiction over the parties for want of proper venue. Under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78aa, venue is proper in a suit brought under Section 13(d) of the Williams Act "in the district where in any act or transaction constituting the violation occurred."

■ The district court pointed out that Section 13(d) creates an affirmative duty to send a 13D Schedule to the issuer's principal executive office. The only possible violation of this provision is the omission to send a legally sufficient 13D Schedule to such office. In light of that fact, we conclude that the failure to send such a schedule to Bath in the Eastern District of Wisconsin must be deemed an "act * * * constituting the violation" which occurred in such district.

■ Furthermore, as the district court also pointed out, once the defendants failed to make the Williams Act disclosures when they were allegedly required to make them, their further activities in furtherance of their plan were themselves illegal and part of the alleged violation for which redress is sought. It is undisputed that certain of these activities, such as the demand for a special stockholders' meeting and list and Blot's demands at the September 16, 1969 board meeting, occurred in the Eastern District of Wisconsin. "All that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events." Puma v. Marriott, 294 F.Supp. 1116, 1120 (D.Del.1969). *See also* Hooper v. Mountain States Securities Corp., 5 Cir., 282 F.2d 195, 203–205 (1960), cert. den. 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Zorn v. Anderson, 263 F.Supp.

745, 748 (S.D.N.Y.1966); Wharton v. Roth, 263 F.Supp. 922 (E.D.N.Y.1964); and Dauphin Corp. v. Davis, 201 F.Supp. 470 (D.Del.1962).

In sum, we hold that sufficient showing has been made to warrant the district court in temporarily enjoining the defendants and others named therein in the form and manner as determined below. Further, we find and order that the prior order of this court entered on April 6, 1970, enjoining the holding of the 1970 annual stockholders' meeting of Bath Industries, Inc., be continued in effect until the further order of this court.

The judgment order of the district court is affirmed. This cause is ordered remanded to the district court for further proceedings not inconsistent with the views expressed herein.

Affirmed and remanded.

---

chises defendants from voting at stockholders' meetings, we have enjoined, on motion of the defendant-appellants, the holding of that meeting until further order of this court. Thus, the *status quo* will continue to be preserved until

it is finally determined whether defendants should be disenfranchised from voting all or any part of the stock which they now hold, some of which they held prior to the alleged violation.