**MOSINEE PAPER CORPORATION, a Wisconsin corporation, Plaintiff,**

v.

**Francis A. RONDEAU et al., Defendants. No. 71-C-335.**

United States District Court, W. D. Wisconsin.

Feb. 13, 1973.

Laurence C. Hammond, Jr., W. Stuart Parsons, of Quarles, Heriott, Clemons, Teschner & Noelke, Milwaukee, Wis., for plaintiff.

David E. Beckwith, of Foley & Lardner, Milwaukee, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action brought under the Securities Act of 1934, as amended. Plaintiff alleges that defendants have violated §§ 13(d) and 14(e) of the Williams Act, 15 U.S.C. §§ 78m(d) and 78n(e), and § 10(b) and Rule 10b–5 of the Securities and Exchange Act, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5. Plaintiff has requested an injunction restraining defendants from voting any common stock of plaintiff held or acquired in violation of the Securities Exchange Act, from using such stock as collateral to secure funds for the purpose of acquiring control of plaintiff, and from acquiring additional common stock of plaintiff until the effects of defendants' violations have been fully dissipated. Plaintiff has also demanded that defendants be required to divest themselves of all or some of defendants' shares of plaintiff's common stock, acquired in violation of the Act. Plaintiff finally requests damages for injuries sustained as the result of defendants' illegal activities. Jurisdiction is present under 15 U.S.C. § 78aa. Defendants First Wisconsin National Bank of Wausau and First Wisconsin National Bank of Milwaukee have filed a motion to dismiss. Plaintiff moved for a preliminary injunction but subsequently said motion was voluntarily withdrawn. A motion for summary judgment in favor of all of the defendants is presently before this court.

I find and conclude that there is no genuine issue of material fact as to the propositions contained in the section of this opinion entitled "Facts."

## FACTS

Plaintiff Mosinee, is a Wisconsin corporation having its principal place of business at Mosinee, Wisconsin, where it is engaged in the business of manufacturing, converting and selling specialty papers, paper products and plastics. Its only class of equity security outstanding and registered pursuant to Section 12 of the Securities Exchange Act, 15 U.S.C. § 78l, is common stock, of which there were 806,177 shares outstanding as of August 31, 1971.

Plaintiff, in recent history and until 1970, had increasing sales and profits. It had a decline in earnings in 1970 and in the first quarter of 1971. In the spring of 1971, the directors of Mosinee reduced its dividend.

The president of the plaintiff is Clarence Scholtens; the Chairman of the Board of Directors is John E. Forester. Collectively, Mr. Forester, who has a law degree but who does not practice law as his occupation, his wife, and trusts established by Mr. and Mrs. Cyrus Yawkey and Mr. Aytchomonde P. Woodson (son-in-law of the Yawkeys) are the largest stockholder of the plaintiff corporation. Mr. Forester is a director of many corporations.

Defendant Francis A. Rondeau, a resident of Mosinee, Wisconsin, is president and general manager of defendant Mosinee Cold Storage, Inc.; president of defendant Wausau Cold Storage Company, Inc.; vice president and a director of defendant Francis Rondeau, Inc.; president and a director of defendant Rondeau Foundation; and a limited partner of defendant Rondeau and Company. Rondeau's formal education ended upon graduation from high school. His present activities include the cold storage business and a variety of investments.

Defendants Mosinee Cold Storage, Francis Rondeau, Inc., and Wausau Cold Storage Company, are Wisconsin corporations having their principal places of business in Wisconsin. Defendant Rondeau Foundation is a Wisconsin nonstock nonprofit charitable corporation with its principal office in Wisconsin. Defendant Rondeau & Company is a Wisconsin limited partnership with its principal place of business in Wisconsin. It is composed of one general partner, defendant George Rondeau and nine limited partners, including defendant Francis Rondeau.

Defendant George Rondeau, a resident of Wisconsin and son of defendant Francis Rondeau, is manager, treasurer, and director of defendant Wausau Cold Storage Company, and is general partner of defendant Rondeau & Company.

Defendants First Wisconsin National Bank of Wausau and First Wisconsin National Bank of Milwaukee are Wisconsin corporations with their principal places of business in Wisconsin.

In the winter of 1971, Mr. Francis Rondeau (hereinafter "Mr. Rondeau"), who was considering investing in plaintiff corporation, openly expressed the opinion on a number of occasions that the plaintiff's stock was a good investment. He made his first purchase in his own name, on April 5, 1971, of 500 shares at $12.50 per share. This initial purchase was registered on the books of the plaintiff's stock transfer agent on April 28, 1971. By May 17, 1971, Mr. Rondeau had acquired a total of 40,413 shares of plaintiff's common stock. It was not until July 9, 1971, however, that plaintiff's stock register indicated that Mr. Rondeau and the other defendants herein were record owners of more than 40,309 shares. (I find that given the 806,177 shares of stock outstanding, it requires approximately 40,309 shares to constitute 5% of the issued and outstanding stock of the plaintiff.) From April 5, 1971, through August 4, 1971, the defendants acquired a total of 66,577 shares of stock.

In April, 1971, both Mr. Scholtens and Mr. Forester learned that Mr. Rondeau had made several purchases of plaintiff's stock. By June 1, 1971, the plaintiff was aware that Mr. Rondeau was president of both the Mosinee and Wausau Cold Storage companies. When Mr. Rondeau's holdings reached 18,000 shares on the plaintiff's records, Mr. Scholtens contacted Mr. Rondeau by telephone, welcoming him as a new substantial shareholder and inquiring into his purpose in purchasing shares. Mr. Rondeau stated that he felt the stock was underpriced and was a good investment; that he intended to continue to purchase shares and might acquire up to 40,000 shares (under 5% of the outstanding stock); and that he was "perfectly happy with the operation."

Mr. Orr, an employee of Forwood, Inc., a corporation presided over by Mr. Forester, and which provides management, accounting, and investment services to the majority shareholders of plaintiff, kept a cumulative total of acquisitions by Mr. Rondeau during 1971; he reported this total to Mr. Forester upon request.*

I find that Mr. Rondeau did not know that he was required to file a Schedule 13D under the Williams Act when his holdings exceeded 5% until he consulted his attorney on or about July 30, 1971, immediately after receiving a letter

---

\* =In Camera.

from Mr. Forester stating that Rondeau's activity in plaintiff's stock may have created problems under the Federal Securities Laws. (In July, Mr. Rondeau's holdings of plaintiff's stock had exceeded 60,000 shares.) Mr. Rondeau had his accountants work continuously thereafter to provide the information needed for the 13D Schedule. Mr. Rondeau placed no further orders for plaintiff's stock after July 30, 1971, although some previously placed orders were filled in August, 1971. He filed his first 13D Schedule on August 25, 1971; on September 2, 1971, this action was commenced; on September 29, 1971, an amendment and supplement to defendants' first 13D Schedule was filed.

Mr. Rondeau had been advised in the past that he didn't need to file anything with the SEC until his holdings of any one company exceeded 10%, which had been the law until December of 1970, when the Securities and Exchange Act was amended to reduce the requirement in Section 13(d)(1) from 10% to 5%. 15 U.S.C. § 78m(d)(1). Mr. Forester was also unfamiliar with the requirements of the Williams Act until a few days before he wrote the letter to Mr. Rondeau, which is dated July 30, 1971.

I find that during July, it was common knowledge, "street talk" among brokers, bankers, and businessmen in the community, that Mr. Rondeau was purchasing plaintiff's stock in substantial quantities. Rumors that Mr. Rondeau was purchasing stock began as early as June, but were vague with respect to the extent of the purchases.

In late 1970, Mr. Forester, for himself, his wife and five of the trusts he managed, decided on the basis of a security analyst's recommendation to invest trust assets in the paper industry. Purchases of the plaintiff's stock began at that time but were discontinued in April, 1971, because of an unusual opportunity to purchase a large block of stock in another paper company. However, that opportunity did not material-

ize, and some portion of the cash accumulated for the first investment was instead invested in plaintiff's stock in late July.* Beginning July 30, 1971, the same day that Mr. Forester had communicated by letter with Mr. Rondeau, and for the next four trading days, Mr. Forester and the trusts he managed purchased over 20,000 shares of plaintiff's stock (not an unusual volume of transactions for the trusts involved).

Although any time a party purchases a substantial portion of a corporation's outstanding stock it is possible to infer that the purchaser is interested in obtaining control, I find that there is no concrete evidence in the record warranting a finding that Mr. Rondeau seriously considered obtaining control of the plaintiff corporation prior to the time that he conversed with his attorney by telephone, after receiving Mr. Forester's letter of July 30, 1971. I find that Mr. Rondeau and the other defendants did not engage in intentional covert, and conspiratorial conduct in failing to timely file the 13D Schedule.

I find that Mr. Rondeau's purchases of plaintiff's stock has created concern on the part of the plaintiff's present management, some of the plaintiff's employees and some shareholders with respect to the consequences of a possible tender offer and subsequent change in control of the company, e. g. the future relationship that Mr. Rondeau might have with the Board, with long-time customers, and with trade unions. I further find that this anxiety may have been somewhat worsened by the rumors about Mr. Rondeau's intentions which resulted from his failure to articulate his purposes in a timely 13D Schedule.

Although the total amount of shares purchased was correctly stated in Mr. Rondeau's 13D Schedule filed on August 25, 1971 (66,577 shares), the allocation of shares among the Rondeau entities shown on said 13D Schedule was inaccurate. The record ownership of these shares is correctly reflected in the de-

fendants' amendment of the 13D Schedule, filed on September 29, 1971:

| | Number of Shares of Record and Beneficially |
|---|---|
| Francis A. Rondeau | 34,679 |
| Mosinee Cold Storage, Inc. | 11,020 |
| Francis Rondeau, Incorporated | 7,060 |
| Wausau Cold Storage Company, Inc. | 3,600 |
| Francis A. Rondeau Foundation, Incorporated | 1,957 |
| Rondeau & Company | 4,600 |
| Ronco | 264 |
| Mosinee Cold Storage, Inc., Wausau Cold Storage Company, Inc., and Francis Rondeau, Incorporated, as participating Employers in The Emjay Corporation Master Profit Sharing Plan dated October 14, 1968 | 3,397 |
| | 66,577 |

Item 3 of Schedule 13D requires a statement as to the filer's source and amount of funds or other consideration:

I. All purchases of the Issuer's common stock made to date have been financed as follows:

1. Approximately $598,000 from Francis A. Rondeau of which approximately $300,000 came from Mr. Rondeau's own funds and the remainder borrowed from Rondeau & Company on open account.

2. Mosinee Cold Storage, Inc. borrowed $30,000 from the First Wisconsince National Bank of Wausau on a 90-day note at 5¼% secured by certain securities owned by it and related companies named herein. This loan has been repaid.

3. Francis Rondeau, Incorporated borrowed $100,000 from the First Wisconsin National Bank of Wausau on a 90-day note at 5¼% secured by certain securities owned by it and related companies named herein. This loan has been repaid.

4. Rondeau & Company borrowed $307,000 from the First Wisconsin National Bank of Milwaukee at an annual interest rate of 6% secured by certain securities owned by it and related companies named herein. This loan has been repaid.

NOTE: Of the funds identified in 1 to 4 above, approximately $865,500 was utilized to purchase common stock of the Issuer and the balance used to make purchases of securities of other corporations.

State the source and amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading the securities, a description of the transaction and the names of the parties thereto. 33 F.R. 11,016 (July 30, 1968) as amended by 33 F.R. 14,110 (Aug. 30, 1968).

In the 13D Schedule filed August 25, 1971, Mr. Rondeau described the sources of his funds as set out fully in the margin.[1] In the amendment filed September 29, 1971, Rondeau further amplified the sources of funds as set out in the margin.[2]

About August 15, 1971, Mr. Rondeau sold 10,000 First Wisconsin Bankshares, which had a market value of $32/share

[1] Francis A. Rondeau and one or more of his controlled corporations and other entities presently are considering investing approximately $3,600,000 of additional funds in the common stock of the Issuer. These funds are expected to be obtained as follows:

(a) $1,200,000 to be invested by Mosiness Cold Storage, Inc., out of proceeds to be received from the sale of real property located in Marathon County, Wisconsin; such transaction is expected to close within the next 12 months;

(b) Francis A. Rondeau and his associates propose to sell approximately $1,000,000 of marketable securities to provide additional funds for investment in common stock of the Issuer;

(c) The balance of the monies, if invested, will be borrowed although no commitments for any such borrowings or loans have been entered into or have gone beyond the negotiation and discussion stage.

[2] 1. With respect to Item 3, the undersigned, Mosinee Cold Storage, Inc., and Francis Rondeau, Incorporated, now state and aver that no part of the proceeds of loans received from First Wisconsin National Bank of Wausau as referred to in paragraphs 2 and 3 of said Item 3 were utilized for the purchase of common stock of the Issuer. However, it has now been determined that Mosinee Cold Storage, Inc. borrowed $50,000 on May 11,

or a total value of $320,000, to Mr. Tom Werner, pursuant to an agreement whereby Mr. Rondeau had the right to repurchase the shares within twelve months at his option, at the price of $320,000, plus interest at the rate of approximately 6%. I find that whether this sale with an option to repurchase is denominated a sale or a loan, Mr. Rondeau had no obligation to disclose this transaction in the 13D Schedule as the cash realized from the transaction was not obtained for the purpose of buying plaintiff's stock nor was it in fact so disbursed. I further find that Item 3 of the 13D Schedule, as amended, is adequate and does not contain misrepresentations of fact.

A few days after Mr. Rondeau's August 25, 1971, Schedule 13D was received by the plaintiff, plaintiff wrote to each of its shareholders and issued a press release calling attention to Mr. Rondeau's statement that he was considering a tender offer. For a few days after this press release, plaintiff's stock was quoted as high as $19–21/share. Within a few days it dropped back to the $12.50–$14 range, where it remained.

## OPINION

■ Plaintiff first opposes defendants' motion on the grounds that there are genuine issues of fact which are unresolved; more particularly, that there is a genuine issue as to whether defendants' conduct was intentional, covert and conspiratorial and as to whether the 13D Schedule, filed by Rondeau, both in its original and amended form, misstates facts concerning his sources of financing purchases of plaintiff's stock. As set out in the above section entitled "Facts," I have made findings from the record herein on both of these issues in favor of the defendants.

Plaintiff also opposes defendants' motion for summary judgment on the grounds that the defendants have not established that they are entitled to judgment as a matter of law. The parties moving for summary judgment must not only establish that the material facts are not in dispute, but must also demonstrate that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e). All inferences are to be drawn against the movant and in favor of the party opposing the motion. 3 Barron & Holtz-

1971, from First Wisconsin National Bank of Wausau at 5½% interest, secured by certain securities, certificates of deposit and insurance policies owned by it and related companies named in the Schedule 13D, and Wausau Cold Storage Company, Inc. borrowed $50,000 on June 29, 1971, from First Wisconsin National Bank of Wausau at 5½% interest, secured by certain securities, certificates of deposit and insurance policies owned by it and related companies named in the Schedule 13D. An undetermined portion of the proceeds of these loans were advanced by said corporations to Francis A. Rondeau and used by him to purchase shares of common stock of the Issuer. Both of the aforesaid loans have been fully repaid.

2. Further, with respect to Item 3, the undersigned, Rondeau & Company borrowed the aggregate sum of $307,000 at 6% annual interest from First Wisconsin National Bank of Milwaukee between May 10, 1971, and July 20, 1971, of which approximately $187,000 was used to purchase common stock of the Issuer

in the name of Rondeau & Company and of Francis A. Rondeau and Francis A. Rondeau, Nominee. The above loans were secured by the collateral pledge to said Bank of shares of common stock of the Issuer and of other securities owned by Francis A. Rondeau and/or his associates identified in this Amended Schedule 13D. The loans from First Wisconsin National Bank of Milwaukee were paid, in full, on August 27, 1971, with proceeds received by Francis A. Rondeau and/or his associates from the sale of securities other than shares of common stock of the Issuer.

3. Further, with respect to Item 3, Francis A. Rondeau states and avers that subsequent to August 9, 1971, he has had discussions with representatives of First Wisconsin National Bank of Milwaukee and Marine National Exchange Bank of Milwaukee relative to he and/or his associates obtaining loans for the purchase of additional shares of common stock of the Issuer. No commitment or agreements relative to any such borrowing has been received or entered into.

off, Federal Practice and Procedure § 1234.

Section 13(d) of the Securities and Exchange Act provides in part:

> Any person, who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered . . . is directly or indirectly the beneficial owner of more than 5 percentum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office . . ., send to each exchange where the security is traded, and file with the Commission, a statement containing such information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. . . . 15 U.S.C. § 78m(d)(1).

In the instant case, the defendants admit that by failing to file a 13D Schedule by May 27, 1971, they violated the filing requirements of the Williams Act, 15 U.S.C. § 78m. Defendants further urge, however, that because a legally sufficient 13D Schedule was subsequently filed, and in the absence of a deliberate, covert conspiracy to take over the plaintiff corporation, plaintiff is not entitled to any relief in this action. Defendants submit that an analysis of the language of § 13(d) of the Securities and Exchange Act, of the legislative history of the Act and of the judicial interpretation of the statute reveals: (1) that § 13(d) is a "notice statute," without provision for sanctions and that the requirement of notice has been satisfied by the late filing in the instant case; (2) that in the absence of deliberate and covert noncompliance with the requirements of the Act, and in the absence of a showing by the plaintiff of irreparable harm, the equitable relief requested by the plaintiff is inappropriate; and (3) that the imposition of sanctions in the instant case would constitute a misapplication of the Williams Act as a barrier to stockholders' democracy, perpetuating entrenched management without majority support.

The plaintiff contends that the violation conceded by the defendants warrants injunctive relief; that the plaintiff is not, as a matter of law, required to prove "irreparable injury" as an element of its claim for equitable relief; and that an appropriate injunction can be fashioned to meet the circumstances of this case.

■ The complaint alleges that plaintiff has suffered irreparable harm as a result of the defendants' failure to timely file the 13D Schedule. However, the plaintiff has not directed this court's attention to any evidentiary material in the voluminous record which would support a finding of irreparable harm. Although the defendant has the burden of proof upon a motion for summary judgment, the plaintiff may not rest upon the mere allegations of his pleadings to establish that there is a genuine issue of fact. Fed.R.Civ.P. 56(e). The defendant here has introduced testimony by both the President and the Chairman of the Board of the plaintiff corporation indicating that the damage sustained by the plaintiff from Mr. Rondeau's activities in general and his late filing of the 13D Schedule in particular, stems from the anxiety of its employees and shareholders about a possible future change in control of the corporation. Absent any other evidence, I must conclude that the plaintiff has not suffered "irreparable harm."

Although one court has stated in dicta that the absence of irreparable harm does not necessarily preclude injunctive relief where the public interest is involved (here the plaintiff asserts the public interest in private enforcement of the federal securities laws and in deterrence of noncompliance with disclosure requirements), Sisak v. Wings & Wheels Express, Inc., 1971 CCH Fed.Sec.L., Rep. § 92,991 at 90,670 (S.D.N.Y.1970), other courts have expressly stated that a finding of irreparable harm is a prereq-

uisite to injunctive relief. *See* Ozark Air Lines, Inc. v. Cox, 326 F.Supp. 1113, 1118–1119 (E.D.Mo.1971).

Judge Kaufman's analysis of the history and purposes of § 13(d) is helpful in deciding what relief is appropriate for violations of the Act followed by subsequent compliance:

> The 1960's on Wall Street may best be remembered for the pyrotechnics of corporate takeovers and the phenomenon of conglomeration. Although individuals seeking control through a proxy contest were required to comply with section 14(a) of the Securities Exchange Act and the proxy rules promulgated by the SEC, and those making stock tender offers were required to comply with the applicable provisions of the Securities Act, before the enactment of the Williams Act there were no provisions regulating cash tender offers or other techniques of securing corporate control. According to the committee reports:
>
> > "The [Williams Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies." S.Rep.No.550 at 4; H.R.Rep.No.1711 at 4, U.S. Code Cong. & Admin.News 1968, p. 2814.
>
> Specifically, we were told, "the purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time." S.Rep.No.550 at 7; H.R.Rep.No.1711 at 8, U.S.Code Cong. & Admin.News 1968, p. 2818. Otherwise, investors cannot assess the potential for changes in corporate control and adequately evaluate the company's worth. *See generally* Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U. Pa.L.Rev. 853, 854–55, 858, 865–66 (1971).
>
> That the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control is amply reflected in the enacted provisions. GAF Corporation v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971).

■ The history of the Act, however, also clearly reveals that § 13(d) was not enacted to provide protection for management against raiders, as there is substantial disagreement as to whether tender offers and stock acquisitions in pursuit of control constitute a desirable and healthy aspect of stockholder democracy. GAF Corporation v. Milstein, 324 F. Supp. 1062, 1069–1070 (S.D.N.Y.1971), rev'd in part, aff'd in part, 453 F.2d 709 (2nd Cir. 1971). *See* H.R. Report No. 1711 at 4, U.S.Code Cong. & Admin. News 1968, pp. 2811–2821. *See also* Bath Industries v. Blot, 427 F.2d 97, 109 (7th Cir. 1970).

Even without concluding that irreparable harm is a prerequisite to relief, it would seem that the instant case provides a particularly inappropriate occasion to fashion equitable relief for the plaintiff. First, the only harm documented is the "anxiety" which could be expected to accompany any change in management, a predictable consequence of shareholder democracy. Congress, in enacting the Williams Bill, attempted to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. H.R. Report No. 1711, *supra* at 2813. Secondly, the record here does not reveal that the defendants engaged in a secret conspiracy to accumulate stock from unsuspecting shareholders before exposing their intention of gaining control in a 13D Schedule. Instead, the record indicates that defendants openly purchased substantial quantities of stock, that management and other

brokers and businessmen were aware of these purchases, and that the defendants promptly complied with the Williams Act soon after becoming aware of the filing requirements and after their plans to attempt to obtain control crystallized. Finally, I note that all of the information required by the Williams Act has been available to both stockholders and management since September 29, 1971, and the record does not reveal that the defendants have proceeded with a tender offer.

The plaintiff cites the following passage from *Bath, supra*, to support its argument that the late filing of defendants' 13D Schedule neither cures nor vindicates the purpose of § 13(d):

> If defendant-appellants were in fact required to file statements . . . sometime near midsummer of 1969, the filing of 13D Schedules in October, 1969, may well be insufficient to cure the failure to file earlier. The purpose of the filing and notification provisions is to give investors and stockholders the opportunity to assess the insurgents' plans before selling or buying stock in the corporation. It additionally gives them the opportunity to hear from incumbent management on the merit or lack of merit of the insurgents' proposals. If the defendant-appellant's late filing is sufficient, then no insurgent group will ever file until news of their existence and plan leaks out and prompts a law suit. By that time it will be too late to avoid the evils which the Williams Act is designed to eliminate. *Bath, supra* at 113.

Although this language is broad and sweeping, it should be noted that the Court of Appeals in *Bath* was affirming the trial court's decision to grant a preliminary injunction, and emphasized that in this area, where a federal statute creates legal rights and only a general right to sue, the discretion of a district court to fashion remedies is broad. *Bath, supra* at 113.

Furthermore, the facts in *Bath* are distinguishable from the instant case. First, it must be noted that the trial court found that the plaintiff sustained irreparable injury as a result of the defendant's failure to timely file a 13D Schedule. Bath Industries, Inc. v. Blot, 305 F.Supp. 526, 537–539 (E.D.Wis. 1969); *Bath, supra* 427 F.2d at 104. In *Bath*, the defendants conspired and agreed to obtain control of the corporation either by threat of or by a proxy battle, timed to coincide with the expected award of a large governmental contract for which the corporation had been actively contending. Such a proxy fight would severely limit the corporation's chances of being awarded the contract and might consequently cause permanent and irreparable harm. Therefore, unlike here, in *Bath*, irreparable injury to the corporation, as distinguished from its present management, flowed from the covert conduct of the defendants, who secretly accumulated stock and solicited allies so that at the appropriate time they could confront management with a *fait accompli*. Plaintiffs in *Bath* clearly demonstrated that had the defendants filed a timely 13D Schedule, management would have been able to better protect the corporation from losing the contract. Furthermore, at the time of ruling on the preliminary injunction the trial court in *Bath* had not yet determined whether defendants had ever filed an adequate 13D Schedule. The court granted a preliminary injunction to "remain in effect until it is determined that the 13(d) statements that have been or will be filed by the defendants are legally sufficient." Bath Industries, Inc. v. Blot, 305 F.Supp. 526, 539. In the instant case I have found that the 13D Schedule filed is adequate.

The plaintiff also brings to my attention the decision in Committee for New Management of Butler Aviation v. Widmark, 335 F.Supp. 146 (E.D.N.Y.1971). In that case, the court granted a preliminary injunction as relief for defendant's cross-motion asserting that one of

the plaintiffs had violated § 13(d). However, the *Butler Aviation* case is distinguishable from the instant case in three material respects: first, the plaintiff there concealed his purchases of stock through the use of nominees so that his ownership did not appear on the corporation's stock transfer records; second, the plaintiff in *Butler Aviation* never filed the required 13D Schedule; and finally, the court's decision in that case immediately preceded the annual meeting of the company's shareholders, so there was no opportunity, as here, for the shareholders to be apprised by management of the information which should have been disclosed to them by the party accumulating stock by filing the 13D Schedule.

For these reasons, I conclude that although the plaintiff has established that the defendants have violated § 13(d) of the Williams Act, the plaintiff is not entitled to equitable relief.

The plaintiff claims that the defendants' failure to file a 13D Schedule also violates §§ 14(e) and 10(b).

Section 14(e) provides in part:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. 15 U.S.C. § 78n(e).

Neither the plaintiff nor the defendants assert that Rondeau has made a public tender offer. Nonetheless the plaintiff contends that the phrase "tender offer" should be construed to include the defendants' series of buy orders prior to the filing of the 13D Schedule in the relatively limited market for the plaintiff's stock. Furthermore, the plaintiff contends that the phrase "in connection with" is broad enough to encompass situations in which a tender offer is being considered.

The plaintiff concedes that it has no authority in point for either of these rather novel propositions. If the plaintiff's contention is based upon the alleged misstatement within the 13D Schedule as finally filed, I note the statement of the district court in GAF Corp. v. Milstein, 324 F.Supp. 1062 (S.D.N.Y.1971), that § 14(e) was not intended to cover fraudulent misstatements in a § 13(d) filing when there has been in fact no public tender offer. *Id.* at 1073. On appeal the Court of Appeals indicated in a footnote that the tender offer transactions covered by § 14(e) are distinguishable from § 13(d) dealings and that the statutory scheme is as follows: § 14(d), 15 U.S.C. § 78n(d), requires disclosure by tender offerors; § 14(e), 15 U.S.C. § 78n(e), the companion section for § 14(d), declares that it is illegal to make false and misleading statements in connection with a § 14(d) tender offer; § 13(d), 15 U.S.C. § 78m(d), requires disclosure of acquisition of ownership by any direct or indirect means; and Congress has not enacted a parallel section, equivalent to § 14(e), for § 13(d). Nonetheless, the Circuit Court concluded that "the obligation to file truthful statements is implicit in the obligation to file with the issuer and *a fortiori*, the issuer has standing under § 13(d) to seek relief in the event of a false filing." GAF Corporation v. Milstein, 453 F.2d 709, 720 n. 22 (2nd Cir. 1971).

█ Whether I conclude that relief for false statements in 13D Schedules is afforded under § 14(e) as suggested by plaintiff or is implicit in § 13(d) as held by the 2nd Circuit, the plaintiff here is not entitled to relief on the basis of this contention, as I have found that the 13D Schedule, as amended, does not contain misrepresentations of material fact or misleading statements.

I also conclude that plaintiff's assertion that defendants' failure to timely file a 13D Schedule is in itself a fraud and deceit under § 14(e) does not jutisfy affording the plaintiff the relief requested. Under plaintiff's construction of § 14(e), the purchaser of stock "in connection with any tender offer" would, in order to avoid committing a fraud, have the same responsibility for prompt filing as is required both under § 13(d) and § 14(d). Even assuming that this rather bizarre construction of these sections in this overlapping manner is correct, I conclude that the restraints upon the granting of equitable relief implicit in the legislative history of 13(d) and in the case law interpreting that section would also have to be applied to cases arising under § 14(e). Otherwise, a defendant's liability would depend upon the plaintiff's arbitrary choice of sections and the purposes of the Williams Act might well be frustrated. As discussed *supra*, I conclude that the plaintiff is not entitled to equitable relief either under § 13(d) or § 14(e).

The plaintiff also asserts that the defendants have violated Section 10(b) and Rule 10b–5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Section 10(b) provides:

> It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 is as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Even assuming that the plaintiff's construction of § 10(b) is proper, i. e. that either the filing of a misleading 13D Schedule or the failure to timely file a 13D Schedule violates § 10(b), as admitted by plaintiff in its brief there is serious question as to whether an issuer has standing to invoke § 10(b) for injunctive relief, when it has neither purchased nor sold securities. The plaintiff cites Judge Friendly's comment in General Time Corporation v. Talley Industries, Inc., 403 F.2d 159, 164 (2nd Cir. 1968): "we would not want to place our approval on a holding that under no circumstances can an issuer have standing to seek an injunction [under Section 10(b)]." Nonetheless, plaintiff has not cited any cases which would indicate that it does have standing under the circumstances of the instant case. In Superintendent of Insurance v. Banker's Life & Casualty Co., 404 U.S. 6, 13 n. 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the United States Supreme Court expressly refused to decide whether an issuer has standing under § 10(b) where the corporation was not a seller or buyer.

I conclude that in the instant case, where management is clearly involved in a fight for control of the corporation, it is inappropriate to afford the corporation standing to sue under the rationale that it is desirable to provide a means, in addition to the Commission, to assure

private enforcement of the Commission's rules and regulations, promulgated to protect the integrity of the marketplace and individual investors:

> It is generally inappropriate to impede a legitimate fight for the control of the management of a corporation. Where the corporation management faces a conflict of interest, and no direct connected interest of the corporation is to be vindicated by the suit, the protection of the objects of Rule 10b–5 through equitable intervention is better left to be administered by the federal administrative agency, the SEC, or other eligible complainants." GAF v. Milstein, 324 F.Supp. at 1072; aff'd 453 F.2d at 721.

Therefore, I conclude that the plaintiff does not have standing to assert the § 10(b) claim.

I further conclude that this decision in favor of all the defendants renders the motion to dismiss filed by two of the defendants moot and that consequently said motion to dismiss must be denied.