MOSINEE PAPER CORPORATION, a Wisconsin corporation, Plaintiff-Appellant,

v.

Francis A. RONDEAU et al., Defendants-Appellees.

No. 73–1277.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1974.

Decided July 16, 1974.

Laurence C. Hammond, Jr., W. Stuart Parsons, Milwaukee, Wis., for plaintiff-appellant.

David E. Beckwith and Benjamin J. Abrohams, Milwaukee, Wis., for defendants-appellees.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and PERRY, Senior District Judge.*

SWYGERT, Chief Judge.

Plaintiff Mosinee Paper Corporation appeals from the grant of summary judgment entered in favor of defendants Francis A. Rondeau and various persons and entities controlled by him.[1] In the district court Mosinee Paper charged that Rondeau had violated section 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78m(d), known as the Williams Act.[2] Rondeau conceded the

---

* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

1. These consist of corporations and business associations owned or operated by Rondeau: Mosinee Cold Storage, Inc.; Francis Rondeau, Incorporated; Wausau Cold Storage Company, Incorporated; Rondeau Foundation; Rondeau & Company; George Rondeau, First Wisconsin National Bank of Wausau; and First Wisconsin National Bank of Milwaukee. In addition, Rondeau's son, George Rondeau, is a defendant to the instant action.

2. Section 13(d) reads as follows:

(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section

violation of section 13(d), admitting that he had purchased eight percent of the issued and outstanding common stock of Mosinee Paper during a period of four months without timely filing a Schedule 13D as required by section 13(d).

Mosinee Paper is a Wisconsin corporation, mainly engaged in manufacturing and selling paper products. Its principal place of business is located at Mosinee, Wisconsin. The company's only class of equity security, registered pursuant to section 12 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78l, is common stock, of which there were 806,177 shares outstanding as of August 31, 1971.

Rondeau made his first purchase of Mosinee Paper stock on April 5, 1971.

3(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) If the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

(d)(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(d)(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

(d)(4) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

(d)(5) The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant in any transaction having such purpose or effect.

(d)(6) The provisions of this subsection shall not apply to—

(A) any acquisition or offer to acquire securities made or proposed to be made by means of a registration statement under the Securities Act of 1933;

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class;

(C) any acquisition of any equity security by the issuer of such security;

(D) any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control or the issuer or otherwise as not comprehended within the purposes of this subsection.

By May 17, 1971 he had acquired 40,309 shares, some in his own name and some in the names of his controlled corporations and other entities. This number was more than five percent of Mosinee Paper's common stock outstanding.

The Williams Act required him to file with the Securities and Exchange Commission and mail to Mosinee Paper a 13D schedule as of May 27, 1971. Rondeau failed to file the schedule. He continued to acquire Mosinee Paper stock and by August 4, 1971 his acquisitions totaled 66,577 shares, about eight percent of Mosinee Paper's stock outstanding. On August 25, 1971 Rondeau filed a 13D schedule. An amended and supplemental schedule was filed on September 29, 1971.

In the district court, although admitting his violation of section 13(d), Rondeau contended that his failure to timely file a Schedule 13D stemmed from a lack of knowledge as to the existence of the reporting requirements of section 13(d) and not from any intention to avoid the disclosure requirements of the Act and thereby assist him in an effort to covertly gain control of Mosinee Paper. Rondeau argued that his violation of section 13(d) did not warrant the imposition of any remedy or equitable relief in view of the following circumstances: He unknowingly and unintentionally failed to file a Schedule 13D; his purchase of eight percent of the common stock was for investment purposes, not control; he did not formulate an intention to seek control of Mosinee Paper until after he was informed by his attorney in early August of the filing requirement under section 13(d); and he filed a Schedule 13D within a reasonable time after learning of his duty to file. The district court agreed with Rondeau's contention that despite his admitted violation of section 13(d) the grant of equitable relief was inappropriate un-der the circumstances. We take an opposite view.[3]

I

Rondeau claims that his failure to timely file Schedule 13D was a mere technical violation of the Act which was cured by the subsequent late filing in August of a Schedule 13D. He contends that the curative effect of the late filing derives from the fact that the overriding purpose of the Williams Act is to provide adequate notice and information to management and shareholders regarding an individual or group seeking control of a corporation prior to a tender offer or a proxy contest. Rondeau urges that the purpose of the Williams Act has not been violated by this allegedly "technical violation" in view of the circumstances that: (1) demonstrate that his purchase of eight percent of Mosinee Paper common stock was for investment purposes, not control, and subsequent to these purchases he was informed by his attorney of the Williams Act filing requirements whereupon he filed a Schedule 13D within a reasonable period of time; and (2) at no time prior or subsequent to filing the Schedule 13D had Rondeau engaged in a tender offer or proxy contest to attain control of Mosinee Paper. It is Rondeau's contention that, absent a showing of an intentional and knowing failure to file or an intent to secure control of the corporation, the failure to timely file a Schedule 13D, of itself, does not transgress the purpose of the Williams Act.

We do not agree with Rondeau's interpretation of the Williams Act for it tends to narrow and limit the Act well short of its intended reach. The legislative history of the Act indicates that it was "designed to require full and fair disclosure" to investors with respect to any "techniques for accumulating large blocks of equity securities of publicly

3. Mosinee Paper raises an additional issue challenging the adequacy of Rondeau's Schedule 13D disclosure. We find Rondeau's Schedule 13D as amended on September 29, 1971 to be legally sufficient and does not contain any material misstatement of facts. Accordingly, we hold plaintiff's challenge to the sufficiency of the disclosure to be without merit.

held companies." 1968 U.S.Code Cong. & Admin.News, pp. 2813, 2814. Speaking directly to its intendment with regard to section 13(d) of the Act, Congress stated:

The purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time. 1968 U.S.Code Cong. & Admin.News, p. 2818.

■ We agree with the Second Circuit's analysis of the Act in GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), that "the purpose of section 13(d) is to. alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control. . . ." 453 F.2d at 717. To this observation we add what is self-evident from the language and legislative history of the Williams Act, the reporting requirements of section 13(d) apply regardless of the purchaser's purpose in acquiring the shares. The sweep of section 13(d) goes beyond the circumstances where the purchaser has formulated an intent to control, but also reaches that point when because of the size of the purchaser's holdings (having attained five percent beneficial ownership of a class of stock) and the fact that he acquired such holdings in a short amount of time, the purchaser portends the *potential* to effectuate a change in control. Under such conditions Congress has deemed it appropriate that investors and management be fully advised of this potential to effect control so that investors may evaluate and adequately assess the corporation's worth in view of the potential, while at the same time allowing management the opportunity to appropriately respond to any potential for a shift in control.[4]

■ Congress desired that investors and management be notified at the earliest possible moment of the potential for a shift in corporate control. To that end, acquisition of five percent of a class of stock was designated as a trigger to bring about full and fair disclosure. By failing to timely file, Rondeau effectively failed to disclose to investors and management the circumstances surrounding his potential to effect the control of Mosinee Paper while at the same time he continued to purchase securities in a market that had not been adequately apprised of such potential. Under the circumstances, Rondeau's failure to timely file was more than a mere technical violation of the Williams Act.

## II

Rondeau contends that it would be improper to grant plaintiff's claim for equitable remedies in view that Mosinee Paper has suffered no harm, let alone irreparable harm by reason of his violation of section 13(d). In addition, Rondeau urges that granting the relief claimed by Mosinee Paper would run contrary to the design of the Williams Act to avoid "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." 1968 U.S.Code Cong. & Admin.News, p. 2813.

■■ Addressing ourselves to Rondeau's first assertion, we are of the view that having transgressed the Williams Act, Rondeau has indeed harmed Mosi-

---

4. It is clear from the language of the Act that Congress intended to include within the scope of the reporting requirements those transactions entered into for investment purposes and not control. The Commission has the discretionary power to exempt from the provisions of section 13(d) any acquisition of securities which the Commission deems "as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer . . . ." Section 13(d)(6)(D). In such a situation, in requesting the discretionary power of the Commission, the burden is on the acquirer of securities to establish through objective data that his acquisition is solely for investment purposes and does not possess the potential to influence the control of the issuer.

nee Paper; that is, pursuant to section 13(d)(1) Mosinee Paper as issuer was entitled to receive a timely filed Schedule 13D. To the extent that the schedule was filed late, Mosinee Paper was harmed for it did not timely receive the relevant information surrounding Rondeau's potential to effect control and was delayed in its efforts to make any necessary response to that potential. Moreover, Mosinee Paper need not show irreparable harm as a prerequisite to obtaining permanent injunctive relief in view of the fact that as issuer of the securities it is in the best position to assure that the filing requirements of the Williams Act are being timely and fully complied with and to obtain speedy and forceful remedial action when necessary.[5]

We disagree with Rondeau's contention that a grant of relief to Mosinee Paper would tip the balance in favor of management thereby creating a weapon to be utilized by an alleged entrenched and inefficient management. The plaintiff seeks in the instant action to vindicate its statutory right to full and timely disclosure of the circumstances surrounding the potential to effect a change of control in its ownership and operations. Moreover, as previously indicated, Mosinee Paper is in a superior position to safeguard the interests of the investing public to assure that the market is receiving adequate and timely disclosure of relevant information required to be reported by section 13(d). Accordingly, in view of the investing public's interest and the right vested in Mosinee Paper to timely disclosure, we do not perceive this as a case where the scales would be tipped in favor of management in the event equitable relief is granted to remedy a clear violation of the terms and purpose of the Act.

## III

Having considered all the circumstances concerning Rondeau's violation of section 13(d)—giving effect especially to the district judge's findings that "Mr. Rondeau and the other defendants did not engage in intentional covert, and conspiratorial conduct in failing to timely file the 13D schedule" and was unaccompanied by a tender offer or proxy solicitation—we instruct the district court enter a decree enjoining Rondeau and his associates from further violations of section 13(d) and that the 26,268 shares, representing three percent of Mosinee Paper common stock purchased between the due date of the Schedule 13D and prior to its actual filing, not be permitted to be voted with respect to any takeover, proxy contest, or vote for officers and membership on the board of directors for a period of five years. We deem such an injunctive decree appropriate to neutralize Rondeau's violation of the Act and to deny him the benefit of his wrongdoing. Bath Industries, Inc. v. Blot, 427 F.2d 97, 113 (7th Cir. 1970); Chris-Craft Industries, Inc. v. Bangor Punta Corp., 480 F.2d 341 (2d Cir. 1973).

The summary judgment in favor of the defendants is reversed, and the cause is remanded for further proceedings consistent with this opinion. Costs on appeal are assessed against the defendants.

PELL, Circuit Judge (dissenting).

The basic issue presented to this court on appeal is whether the district court erred in granting summary judgment to the defendants. The plaintiff, in the conclusion to its original brief, asserts that the "erratic, inconsistent responses to deposition questions both as between witnesses and by the same witness (Mr. Rondeau) renders it impossible to deter-

---

5. The plaintiff's position as prime enforcer of the Act emanates from the fact that a corporation has a continuous and ongoing interest in the identity and composition of its ownership and has the necessary resources, financial and otherwise, to assure compliance with the Act and to seek remedial relief where the provisions of the Act have been violated.

mine the facts and the appropriate scope of the relief to be granted without live testimony and cross-examination." The majority opinion finds in effect no necessity for any evidentiary hearing but, presumably taking the facts as found by the district court, it reverses that court and directs the entry on remand of a remedial injunction, which, because of the implicit acceptance of the district court's factual findings, can only have been based upon a highly technical violation of the Williams Act, one which I cannot conceive justifies the harsh injunctive penalty to be inflicted.

The Williams Act by its terms does not provide any penalties for its violation, nor does it mandate any civil remedy. While I would not gainsay that the courts may properly fashion a remedy for a violation of the Act, I do not conceive that Congress intended that the punishment should do otherwise than fit the crime. Therefore, assuming there was no genuine issue of material fact presented to the district court, a separate issue which does cause me concern, I am unable to concur in the result reached by the majority. Accordingly, I respectfully dissent.

The majority, by directing the entry of an injunction against the defendants, indicates that for the purpose of the disposition of this appeal it can be taken that there is no genuine issue of material fact requiring a further evidentiary hearing. Assuming that posture, at least *arguendo*, I therefore turn to the facts. These are adequately set forth in the detailed opinion of the district court and need not be repeated except as pertinent, here. Mosinee Paper Corporation v. Rondeau, 354 F.Supp. 686 (W.D.Wis. 1973).

Upon completion of an analysis of those facts, and there is no question that the defendants technically violated the Act in that they did purchase more than 5% of plaintiff's outstanding common stock without filing the requisite Schedule 13D on a timely basis, I am left with the conviction that the majority decision stripped to its essentials is that the management interests of a corporation can cause the enjoining for a substantial period of time of a shareholder's ordinary rights in all stock purchased between the date the purchases exceed 5% and the date the 13D Schedule is filed, irrespective of motivation, irrespective of irreparable harm to the corporation, and irrespective of whether the purchases were detrimental to investors in the company's stock. The violation timewise is apparently all that is needed to trigger this result. I do not conceive that this was the purpose of the Act.

I agree with the statement in the majority opinion that the "reporting requirements of section 13(d) apply regardless of the purchaser's purpose in acquiring the shares." But the violation is conceded by all concerned. We are instead confronting the matter of remedy and indeed whether any remedy is appropriate or needed.

The plaintiff below apparently regarded issues as significant which the majority opinion finds are of no consequence. Thus, plaintiff contended that there was a genuine issue of material fact in dispute as to whether defendants' conduct (i. e., their motivation) was intentional, covert, and conspiratorial. 354 F.Supp. at 692. The majority opinion is willing to assume that it was not. The plaintiff alleged in its complaint and claims on appeal irreparable harm. 354 F.Supp. at 693. The majority opinion seems to find harm, although not categorizing it as irreparable, but states that in any event the plaintiff need not show irreparable harm as a prerequisite to obtaining permanent injunctive relief.

As I read the majority opinion, the rationale for this conclusion is along the line that the issuer of the stock is serving in the capacity of a private attorney general to assure that the filing requirements of the Act are met. I would not quarrel with the right to institute litigation for this purpose. "[T]he issuer has not only the resources, but the self-interest so vital to maintaining an injunctive action." GAF Corporation v. Milstein, 453 F.2d 709, 719 (2d Cir.

1971), cert. denied, 406 U.S. 910, 92 S. Ct. 1610, 31 L.Ed.2d 821 (1972). In speaking of this, however, we are dealing with the matter of standing. In the present appeal, on the other hand, we are past that threshold issue and are concerned with the appropriateness of a remedy for a violation of the Act. Certainly here the standing was not being exercised for the purpose of securing the filing of the 13D Schedule. That schedule was filed on August 25, 1971, and the present action was not brought until September 2, 1971.

Before looking further at the facts, which apparently the majority accepted as they were found to be by the district court, it is well to recall that we are considering the propriety of the use of an equitable remedy, the injunction. In so doing we start with the cardinal principle that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres v. Westover, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959). (Footnote omitted.) I am unaware of any reason for lowering the standards in the use of the injunction and agree with Judge Doyle's observation of what the law is in this respect:

> "Although one court has stated in dicta that the absence of irreparable harm does not necessarily preclude injunctive relief where the public interest is involved . . ., Sisak v. Wings & Wheels Express, Inc., 1971 CCH Fed.Sec.L.Rep. § 92, 991 at 90, 670 (S.D.N.Y.1970), other courts have expressly stated that a finding of irreparable harm is a prerequisite to injunctive relief. *See* Ozark Air Lines, Inc. v. Cox, 326 F.Supp. 1113, 1118–1119 (E.D.Mo.1971)." 354 F.Supp. at 694–695.

This court in Bath Industries, Inc. v. Blot, 427 F.2d 97, 113 (7th Cir. 1970), after carefully analyzing the facts before it, observed that "we cannot say that the court erred in finding that irreparable harm would be done to [the issuer] and its stockholders unless defend-ants were enjoined from now proceeding with their plan . . . ." I do not find the basis for such a statement as to irreparable harm in the present case, certainly not on the basis of the facts before the court in the summary judgment disposition. In *Bath,* as Judge Doyle demonstrates so clearly in distinguishing it, 354 F.Supp. at 695, "irreparable injury to the corporation, as distinguished from its present management, flowed from the covert conduct of the defendants, who secretly accumulated stock and solicited allies so that at the appropriate time they could confront management with a *fait accompli.*" (Emphasis in the original.)

Turning to the facts of the present case as contained in the district court's opinion, I note the following which I would deem to be of significance in determining the necessity of the injunctive relief directed by the majority opinion.

Francis Rondeau, who was the moving force of the defendants, determined in the early months of 1971 that plaintiff's stock would be a good investment because it was underpriced. He made his first purchase of 500 shares early in April of that year. The president and the board chairman of plaintiff both learned in the same month of several purchases by Rondeau. When the company records showed that the holdings of defendants, the associational identity of which was known to plaintiff, had reached 18,000 shares, plaintiff's president called Rondeau by telephone and inquired as to his purpose in purchasing the stock. Rondeau stated that he felt the stock was underpriced and was a good investment; that he intended to continue to purchase shares and might acquire up to 40,000 shares (under 5% of the outstanding stock); and that he was "perfectly happy with the operation."

Unless we draw an inference from the slim basis of the statement that he was going to buy less than 5% of the stock, an inference I do not deem this court on appeal may properly draw for purposes of fashioning a remedy, we would not be

able to say that the record refutes the good faith of Rondeau's statement to the company president.

During 1971, a company which provided management, accounting, and investment services to the majority shareholders of plaintiff kept a cumulative total of acquisitions by Rondeau which were reported to the board chairman of the plaintiff. Rondeau did not know that he was required to file a Schedule 13D when his holdings exceeded 5% until he consulted his attorney on the matter about July 30, 1971, immediately after receiving a letter from the plaintiff's board chairman stating that Rondeau's activities in plaintiff's stock may have created problems under the federal securities laws.

Thereafter, Rondeau had his accountants work continuously to provide the information needed for the Schedule 13D. He placed no further orders for plaintiff's stock at any time after July 30, 1971. Rondeau had been advised in the past that he did not need to file anything with the SEC until his stock holdings in any one company exceeded 10%, and this indeed had been the law until December of 1970, when the Act was amended to lower the requirement from 10% to 5%. As a matter of fact, the plaintiff's board chairman was also unfamiliar with the requirement of the Williams Act until a few days before he wrote the letter to Rondeau on July 30, 1971.

Moreover, Rondeau's acquisitions were not secretive. It was common knowledge, "street talk" among brokers, bankers, and businessmen in the community, that Rondeau was purchasing plaintiff's stock in substantial quantities.

There was no concrete evidence in the record warranting a finding that Rondeau seriously considered obtaining control of plaintiff corporation prior to August 1971.

In the Schedule 13D filed August 25, 1971, it was indicated that defendants *at that time* were considering a tender offer. A few days after receipt of this schedule, plaintiff wrote to each of its shareholders and issued a press release calling attention to the statement that a tender offer was being considered by the Rondeau interests.

I cannot do otherwise than to agree with Judge Doyle on the basis of the facts as established by him, which are not disputed by the majority opinion, that there was no basis for a determination of irreparable injury to the plaintiff. To grant an injunction on the sole basis of a belated filing appears to me to be exalting form over substance, to be bringing an artificial and unduly restrictive sanction into the law of securities, and to be ignoring the real purpose of the Williams Act, which "was designed for the benefit of investors and not to tip the balance of regulation either in favor of management or in favor of the person seeking corporate control," *GAF Corporation, supra*, 453 F.2d at 717 n. 16, particularly in the situation when corporate control had not yet been an objective at the time of the unreported acquisitions. In sum, without irreparable harm being shown injunctive relief is not warranted.

The stultifying effect of too rigid an application of remedies in the present area is illuminatively set forth in Comment, The Courts and the Williams Act: Try a Little Tenderness, 48 N.Y.U.L. Rev. 991 (1973). The Comment is devoted to the impact of judicial decisions regarding the disclosure requirements on tender offers; its introductory observations are pertinent to our present question (at 991–92):

"A cash tender offer is 'a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price.' It is the only realistic means by which a person or group can acquire corporate control when opposed by hostile management. In the favorable economic and legal environment of the 1960's, the cash tender offer became a favorite tool of companies seeking diversification or profitable investments; the inevitable advent of

federal regulation, in the form of the Williams Act disclosure requirements, did not dampen its dramatic growth. In 1973, however, courts began to show an increasing tendency to use disclosure requirements to halt and destroy contested cash tender offers —a tendency so pronounced that cash tender offers, at least when contested by incumbent management, may soon become extinct.

"This imminent extinction is not deliberately contrived; it is the work of well-meaning courts which strive only to protect shareholders called upon to tender their securities. In protecting them, however, courts have demanded unrealistically high standards of disclosure about the offer. In shaping relief, moreover, courts have inadvertently failed to preserve the delicate balance necessary for the tender offer's survival. As a result, even if the violation is slight and easily cured, the offer almost always dies, never to be resurrected." (Footnotes omitted.)

In the present case, we have an even weaker situation than that contemplated in the Comment. Here, there had been acquisition of an amount of stock less than the amount originally required under the Act for reporting, one immeasurably removed from any realistic potential for control, and an acquisition found to be based solely on investment purposes. Section 13(d)(1)(C) requires the person filing to disclose any intention to acquire control. At the time the 5% was exceeded, there would have been nothing to report except the meagre facts of the acquisition and the source of the funds used.

Persons purchasing stock as an investment because it is underpriced rapidly lose interest when the latter status disappears as it ordinarily does when a tender offer or proxy fight emerges. That the purpose of the Act was to protect the shareholders by affording them notice of the prospect of an artifically induced price resulting from a struggle for control rather than being directed at the mere investor is reflected in Section 13(d)(6)(D), which empowers the commission to exempt any acquisition or proposed acquisition "as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purpose of this subsection."

I am further concerned by the far reaching scope of the injunction directed to be entered by the majority opinion. The restriction against voting the 26,268 shares is not directed against Rondeau or his associates but is apparently to be applied on an in rem basis to the stock itself. Further, this taint is to be for a period of five years without specification of the effective beginning date, which would mean that if it is to run for five years from the date of the entry of the injunction, at least some of the normal perquisites of the shares would have been neutralized for a total of nearly eight years.

The discussion to this point has been predicated upon the facts as stated by Judge Doyle, as to which the majority opinion expressed no question of correctness. On that basis, I would dissent from the opinion for the reasons stated.

I nevertheless have a serious reservation as to the propriety of affirmance. The problem, not an uncommon one at the appellate level, is the propriety of the granting of summary judgment when one party vigorously argues the existence of a dispute as to issues of material fact. The problem is not made easier of solution by the use of findings in the district court opinion. This court has observed in other cases that the use of findings is "ill advised since it would carry an unwarranted implication that a fact question was presented." General Teamsters, Chauffeurs & Helpers Union v. Blue Cab Co., 353 F.2d 687, 689 (7th Cir. 1965). I am convinced, however, that the district court intended nothing more than to state what the uncontroverted facts were for decision.

A second aspect of the problem is that if the determination of the motion for

summary judgment required the trial court to choose between conflicting possible inferences from the evidence, the motion should not have been granted. Sarkes Tarzian Inc. v. United States, 240 F.2d 467, 470 (7th Cir. 1957). Inferences, however, have to be drawn not from vaporous supposition but from facts established in the record. The parties had a full opportunity to develop that record, and the plaintiff deposed without success those who would have been able to have placed Rondeau in the position of covertly attempting to wrest control if such had been his intention at the time of acquisition.

While the question may be a close one, the well reasoned opinion of Judge Doyle, cast in the light of the purpose of the Act, persuades me that summary judgment was proper. While the standards of whether a summary judgment should be granted should not vary according to the type of the case, nevertheless, since "in too many situations, target management is pursuing its own interests to the exclusion of those of the investors," Comment, The Courts and the Williams Act: Try a Little Tenderness, *supra* at 1018, the investing public does have an interest in prompt disposition of the challenges arising in the factual situation here presented, an object lending itself to accomplishment by the summary judgment route.

That gamesmanship is becoming the order of the day in the area of acquisition-for-control of securities law is illustrated by a recent Second Circuit opinion, Missouri Portland Cement Company v. Cargill, Incorporated, 498 F.2d 851 (2d Cir. 1974), in which Judge Friendly speaking for the court stated:

> "This appeal illustrates the growing practice of companies that have become the target of tender offers to seek shelter under § 7 of the Clayton Act, 15 U.S.C. § 18. Drawing Excalibur from a scabbard where it would doubtless have remained sheathed in the face of a friendly offer, the target company typically hopes to obtain a temporary injunction which may frustrate the acquisition since the offering company may well decline the expensive gambit of a trial or, if it persists, the long lapse of time could so change conditions that the offer will fail even if, after a full trial and appeal, it should be determined that no antitrust violation has been shown. Such cases require a balancing of public and private interests of various sorts. Where, as here, the acquisition would be neither horizontal nor vertical, there are 'strong reasons for not making the prohibitions of section 7 so extensive as to damage seriously the market for capital assets, or so broad as to interfere materially with mergers that are procompetitive in their facilitation of entry and expansion that would otherwise be subject to serious handicaps.' These reasons are especially compelling when the target company fails to show that the alleged antitrust violation would expose it to any readily identifiable harm." Slip opinion at 4050–51 (footnote omitted).

In connection with a claimed Williams Act violation, Judge Friendly observed:

> "Courts should tread lightly in imposing a duty of self-flagellation on officers with respect to matters that are known as well, or almost as well, to the target company; some issues concerning a contested tender offer can safely be left for the latter's riposte." Slip opinion at 4088 (footnote omitted).

Subsequent to oral argument in this cause, counsel brought to the attention of the court a per curiam order of the Eighth Circuit in Tri-State Motor Transit Co. v. National City Lines, No. 73–1867 (April 4, 1974). That court affirmed the district court's granting of a summary judgment motion to a defendant charged with a section 13(d) violation of failure to file, which motion was granted on the ground that the stipulated facts revealed no deliberate covert and conspiratorial noncompliance with the requirements of 13(d). In affirming, the court of appeals stated that in-

junctive relief was not warranted, citing Judge Doyle's opinion in the present case. Inasmuch as the Eighth Circuit order, although apparently a case of first impression on the present issue at the appellate level, was, under the rule of that circuit, an unpublished order not to be cited, and because of the lack of any factual development in the order, I have not relied upon the case as authority. I do note the case, however, because its disposition as contrasted with that in the majority opinion in the present case suggests the possibility of a split of authority between circuits.

For the reasons herein indicated, I would affirm the judgment of the district court.