# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1299

HARRY EDELSON,

*Plaintiff-Appellant*,

*v.*

RAYMOND K.F. CH'IEN, PETER Y.H.
YUNG, ASIA PACIFIC ONLINE, and
CHINADOTCOM CORPORATION,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 7320—**Amy J. St. Eve**, *Judge.*

_____

ARGUED JUNE 3, 2004—DECIDED APRIL 25, 2005

_____

Before BAUER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Harry Edelson brought the present action against chinadotcom corporation ("Chinadotcom"),[1] Raymond K.F. Ch'ien, Peter Yip Hak Yung and Asia Pacific

---

[1] Although both parties refer to Chinadotcom without an initial capital, we employ the capital for ease of reading.

Online for an alleged violation of § 13(d) of the Securities and Exchange Act ("Exchange Act"), 15 U.S.C. § 78m(d), and other claims. Mr. Edelson sought preliminary and permanent injunctive relief as well as damages. The district court determined that Mr. Edelson could not sustain a private cause of action under § 13(d), denied Mr. Edelson injunctive relief and dismissed his § 13(d) claim. For the reasons set forth below, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. Changes in Chinadotcom's Board

Mr. Edelson served as an outside, non-management director on Chinadotcom's Board of Directors ("Board") from 1999 until 2003.[2] Chinadotcom is a Cayman Islands company, headquartered in Hong Kong; its stock trades on the NASDAQ exchange. Mr. Yip is Vice-Chairman of the Board and Chinadotcom's Chief Executive Officer ("CEO"); Mr. Ch'ien is Chinadotcom's Chairman of the Board. All three men, Mr. Edelson, Mr. Yip and Mr. Ch'ien, hold stock in Chinadotcom.[3]

---

[2]  Because the case comes to us as an appeal from the grant of a motion to dismiss, all well-pleaded facts in the complaint are deemed true and all reasonable inferences from the facts are drawn in Mr. Edelson's favor. *See First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002).

[3]  Asia Pacific Online Ltd. ("APOL") is record owner of 16,135,686 shares of Chinadotcom stock. APOL is owned by Mr. Yip's spouse

(continued...)

Beginning in early 2003, Mr. Edelson began having serious disagreements with Chinadotcom's management, especially Mr. Yip and Mr. Ch'ien, regarding various governance issues. A major source of contention was the propriety of a company-sponsored stock buy-back program. Mr. Yip was in favor of the program according to which Chinadotcom would repurchase issued shares at $3.75 per share. Mr. Yip and Mr. Ch'ien would have benefitted personally from this buy-back because they recently had acquired additional Chinadotcom shares at less than $3.75 per share. Mr. Edelson and another board member, J. Carter Beese,[4] questioned the propriety and legality of the buy-back. Consequently, the Board requested that attorney Steven Chan determine if there were any legal or ethical obstacles to the plan.

This dispute remained unresolved at the March 18, 2003 Board meeting. It also prompted an April 16, 2003 e-mail from Mr. Edelson to Mr. Ch'ien in which Mr. Edelson alleged that the independent directors on the Board were being bulldozed in violation of the Sarbanes-Oxley Act, 15 U.S.C. § 7201 et seq., with the result that good corporate governance was being disregarded.

About the same time of the e-mail, the Board was in the process of nominating a new slate of directors. The terms of all three directors who served on the audit committee— Mr.

---

[3] (...continued)
and a trust established for the benefit of Mr. Yip's children. Mr. Yip's wife owns an additional 442,219 shares. According to the complaint, Mr. Yip is the beneficial owner of all of these shares.

[4] Beese is a former member of the Securities and Exchange Commission ("SEC") and sat with Mr. Edelson on Chinadotcom's audit committee.

Edelson, Beese and Thomas Britt—were set to expire. The annual meeting notice to Chinadotcom stockholders recommended the re-election of all three of these members of the Board; specifically, Mr. Edelson was recommended for a two-year directorship, Beese for a three-year director-ship and Britt for a one-year directorship. The nominations were unopposed, and the election was uncontested. "Neither Yip nor Ch'ien asserted any outward or overt objection to Edelson's nomination for re-election to the Board, and they purported to concur in the Board's recommendation that Edelson and the other candidates be elected." R.1 ¶ 24.

At the June 17, 2003 Annual Meeting, Mr. Edelson and Beese were defeated in an election in which only forty-eight percent of the shares were voted. Of the votes cast, 18,766,947 shares were voted in favor of Mr. Edelson's re-election, 28,264,956 were voted against Mr. Edelson's re-election, and 800 abstained. The votes for Beese were closer in number: 18,800,491 votes were cast in favor of Beese's re-election, 19,945,905 against his re-election, and 8,285,307 ab-stained. Britt, on the other hand, received 46,910,753; only 121,150 shares voted against him, and there were 800 abstentions. The shares beneficially owned by Mr. Yip were voted against both Mr. Edelson and Beese; these shares con-stituted "more than two-thirds" of the votes cast against Mr. Edelson. R.1, ¶ 28.

### 2. Mr. Yip Files Disclosures

Mr. Yip, as beneficial owner of more than five percent of the issued and outstanding shares of a class of Chinadotcom stock, is required to file certain disclosures under § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d). By rule, a shareholder may file a less-onerous disclosure form, Schedule 13G, if the individual submitting the filing "[h]as not acquired the

securities with any purpose, or with the effect of, changing or influencing the control of the issuer." 17 C.F.R. § 240.13d-1(c)(1).

On January 8, 2003, Mr. Yip filed a Schedule 13G disclosure. The following certification appears on the Schedule 13G form, which was signed by Mr. Yip:

> By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.

R.1, Ex.A at 4. No subsequent schedule was filed prior to Mr. Yip's voting of his shares against Mr. Edelson and Beese at the 2003 shareholder meeting.

## B.  District Court Proceedings

On October 15, 2003, Mr. Edelson filed the present action. His two-count complaint alleged violations of § 13(d) as well as tortious interference with prospective economic advantage. Mr. Edelson sought damages as well as preliminary and permanent injunctive relief. "The intent of the requested injunction," Mr. Edelson stated in his separate motion for a preliminary injunction, "is simply to prevent chinadotcom from conducting a stockholders meeting that would deprive Edelson, a former chinadotcom Director, of the opportunity to campaign to regain his chinadotcom Board seat." R.36, Ex.A at 1.

Chinadotcom opposed Mr. Edelson's motion for a preliminary injunction and also moved to dismiss Mr. Edelson's

complaint.[5] With respect to the preliminary injunction, Chinadotcom argued first that Mr. Edelson could not show a likelihood of prevailing on the merits because he had not alleged any wrongdoing by Chinadotcom. Additionally, the company argued that Mr. Edelson lacked standing to bring a § 13(d) action because Congress did not intend § 13(d) to be a mechanism for ex-directors to settle old feuds. Chinadotcom also maintained that the premise underlying Mr. Edelson's argument—that Mr. Yip's action in voting against the recommended slate of directors evidenced an intent to control Chinadotcom—was faulty. According to Chinadotcom, Mr. "Edelson's construction of Rule 13d-1(e)(1), taken to its logical conclusion, would mean that no Schedule 13G filer would ever be able [to] vote its securities in a board election or any other proposal at a shareholder meeting without first filing a Schedule 13D because the mere voting of securities is . . . equivalent to 'changing or influencing control of the issuer.' " R.4 at 10. Finally, Chinadotcom posited that Mr. Edelson could not establish irreparable harm if the injunction did not issue. Chinadotcom pointed to the fact that the election that had ousted Mr. Edelson already had occurred—any harm already had taken place. Therefore, Mr. Edelson did not establish the need for urgency that typically accompanies a preliminary injunction.

In addition to opposing the motion for preliminary injunctive relief, Chinadotcom also moved to dismiss the complaint. In its motion, Chinadotcom reiterated its argument that Mr. Edelson had failed to allege any wrongdoing

---

[5] Chinadotcom was the only defendant that had been served at the time of the briefing described above and the disposition of the motion to dismiss. Consequently, Chinadotcom is the only defendant before this court on appeal.

on its part—a necessity to sustain the complaint: "Though chinadotcom is included as a defendant, the Complaint fails to allege any act or omission by chinadotcom which would constitute a violation of Section 13(d). Indeed, Edelson has not even alleged that chinadotcom is subject to the reporting requirements of Section 13(d)." R.16 at 5. Chinadotcom also renewed its claim that Mr. Edelson lacked standing to pursue a § 13(d) private cause of action. According to Chinadotcom, a § 13(d) cause of action was not open to ex-directors seeking "to get back at their previous co-fiduciaries for disagreements or squabbles lost along the way." *Id.* at 12 (internal quotation marks and citations omitted).

By order of January 28, 2004, the district court denied Mr. Edelson's request for injunctive relief and dismissed Count I of Mr. Edelson's complaint.[6] After outlining the standards for a preliminary injunction, the district court held that a preliminary injunction was not warranted in this case because Mr. Edelson "cannot show a likelihood of success on the merits of his claim." R.27 at 4. Indeed, the court determined Chinadotcom's motion to dismiss should be granted because Mr. Edelson was not entitled to the protections—including the implied cause of action—of § 13(d). The district court noted that, in *Indiana National Corp. v. Rich*, 712 F.2d 1180 (7th Cir. 1983), this court had recognized the existence of an implied cause of action for prospective relief for issuers such as Chinadotcom to remedy violations of § 13(d). However, the district court

---

[6] Mr. Edelson had moved to amend his complaint to add Chinadotcom as a defendant in Count II. As part of its order, the district court granted Mr. Edelson leave to file an amended complaint addressed only to this count. The propriety of the district court's order granting Mr. Edelson leave to amend his complaint is not before the court.

believed that *Indiana National* must be read in conjunction with more recent district court opinions which held that a disappointed former director of a corporation could not pursue an implied cause of action under § 13(d). *See Mates v. N. American Vaccine, Inc.*, 53 F. Supp. 2d 814 (D. Md. 1999); *Nowling v. Aero Serv. Int'l, Inc.*, 752 F. Supp. 1304 (E.D. La. 1990). The court explained:

> This Court declines to extend the ruling of the Seventh Circuit and create a new cause of action under Section 13(d) for former directors whom management has ousted. If there is a spectrum of shareholder sophistication, with "unsuspecting investors" on one end, and "well-informed members of management who can adequately protect their own interests" on the other, then Edelson certainly lies closer to management than to the common shareholder.

R.27 at 12. The court concluded that Congress "did not intend former directors to wield Section 13(d) on their own behalf" and, therefore, dismissed Count I of the complaint. Mr. Edelson timely appealed.[7]

## II

## DISCUSSION

The gravamen of Mr. Edelson's complaint is that Mr. Yip's intent to vote against Mr. Edelson amounted to an intent to influence the governance of Chinadotcom. Because Mr. Yip failed to disclose this intent and to file the required Sched-

---

[7] After oral argument, at the request of this court, the SEC submitted a brief addressing some of the issues presented in this litigation. We express our appreciation to the SEC for its submission.

ule 13D, Mr. Edelson contends that Mr. Yip's votes against him should not have been counted, and a new election for directors must be held.

Mr. Edelson's action raises fundamental issues regarding § 13(d) and the contours of the implied right of action thereunder. First, the present action raises the issue of the scope of the private right of action under § 13(d)—specifically, whether Mr. Yip's failure to disclose his intent, under the circumstances presented here, is sufficient to state a cause of action. The second issue raised by Mr. Edelson's appeal is who may bring a cause of action under § 13(d): Does Mr. Edelson's status as a former director preclude him from invoking the protections guaranteed general shareholders by § 13(d)? Finally, this action also poses the question whether an issuer—as opposed to an individual shareholder—can be a proper defendant to a § 13(d) cause of action, here Chinadotcom. Because we hold that, under the circumstances of this case, a shareholder may not institute a private cause of action pursuant to § 13(d), we have no occasion to address whether Mr. Edelson is a proper plaintiff or whether Chinadotcom is a proper defendant.

## A. The Evolution of Private Causes of Action Under § 13(d)

Our first task is to discern whether the allegations contained in Mr. Edelson's complaint, specifically, Mr. Yip's failure to disclose his intent to vote his shares against a sitting director, states a claim under § 13(d). Although we have not had an occasion to address the specific question presented to us, we do not write on a clean slate with respect to the nature and contours of the § 13(d) private right of action. Almost thirty years ago, this court explicitly recognized that § 13(d) created a private cause of action. *See*

*Indiana Nat'l*, 712 F.3d at 1185. Even before that time, this court and the Supreme Court had discussed the scope of § 13(d) and the parameters of an implied right of action based on that provision, as well as on other provisions of the Williams Act, Pub. L. No. 90-439, 82 Stat. 454 (1968). We turn first to these cases to guide our inquiry.

Our review begins with the decision of this court in *Bath Industries, Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970). Before the court was an order by the district court enjoining the appellant stockholders from "proceeding with their plan (including, but not limited to removing the chief executive officer of (plaintiff) Bath and calling for a special shareholders meeting) until they have complied with Section 13(d)." *Id.* at 101 (internal quotation marks omitted). None of the named defendants owned, individually, ten percent or more of the stock of Bath Industries.[8] Thus, this court first had to determine whether the individual defendants constituted a "group" acting "for the purpose of acquiring, holding, or disposing of securities of an issuer," such that, collectively, they were subject to the Act's disclosure requirements. *Id.* at 108. In order to answer this question, we stated, it was necessary to "honor the whole Congressional intent" of the Williams Act, not just the specific passages relied upon by the parties. To assess this intent, we turned to the legislative history of the Williams Act which

> convince[d] us that the overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the

---

[8]  The Williams Act's disclosure requirements originally applied to individuals who owned ten percent, as opposed to five percent, of a specific class of stock.

> purpose of solidifying their own position in a contest over how or by whom the corporation should be managed.

*Id.* With this intent in mind, we concluded that "the Act should be interpreted to require compliance with its disclosure provisions when, but only when, any group of stockholders owning more than 10% of the outstanding shares of a corporation agree to act in concert to *acquire* additional shares." *Id.* (emphasis added).[9]

The Supreme Court provided additional insight into the scope of private causes of action under § 13(d) in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975). In *Rondeau*, the Court addressed the issue "whether a showing of irreparable harm

---

[9] The Second Circuit in *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), reached a different result with respect to when the disclosure requirements come into play for investors that agree to use their shares as a block:

> In light of the statutory purpose as we view it, we find ourselves in disagreement with the interpretation of Bath Industries . . . . The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of *potential changes* in control resulting from new aggregations of stockholdings and was not intended to be restricted to only individual stockholders who made future purchases and whose actions were, therefore, more apparent. . . . It hardly can be questioned that a group holding sufficient shares can effect a takeover without purchasing a single additional share of stock.

*Id.* at 718 (citations and footnote omitted; emphasis in original). As will be discussed in greater detail below, the distinction drawn by the Second Circuit—between new acquisitions and new aggregations of stock—does not affect the outcome in the present action.

[wa]s necessary for a private litigant to obtain injunctive relief in a suit under § 13(d)." *Id.* at 50-51. In that case, petitioner Rondeau, over time, had accumulated a large quantity of Mosinee stock. When Rondeau had acquired the threshold amount of five percent of the stock, he failed to make the disclosures required by § 13(d). Rondeau eventually accumulated 60,000 shares of stock. At that time, Mosinee's president advised Rondeau that his purchases may have created problems under the federal securities laws. After receiving this warning, Rondeau ceased purchases, consulted an attorney and subsequently filed a § 13(d) disclosure which stated:

> "Francis A. Rondeau determined during [the] early part of 1971 that the common stock of the Issuer (respondent) was undervalued in the over-the-counter market and represented a good investment vehicle for future income and appreciation. Francis A. Rondeau and his associates presently propose to seek to acquire additional common stock of the Issuer in order to obtain effective control of the Issuer, but such investments as originally determined were and are not necessarily made with this objective in mind. Consideration is currently being given to making a public cash tender offer to the shareholders of the Issuer at a price which will reflect current quoted prices for such stock with some premium added."

> Petitioner also stated that, in the event that he did obtain control of respondent, he would consider making changes in management "in an effort to provide a Board of Directors which is more representative of all of the shareholders, particularly those outside of present management . . . ." One month later petitioner amended the form to reflect more accurately the allocation of shares between himself and his companies.

*Id.* at 53-54. After receiving the disclosure, Mosinee informed its stockholders of the information provided by Rondeau and also responded to Rondeau's plans to seek control of the company and effect changes in the management structure. Mosinee then filed an action in district court seeking "an injunction prohibiting the petitioner and his codefendants from voting or pledging their stock and from acquiring additional shares, requiring them to divest themselves of stock which they already owned." *Id.* at 55.

The Supreme Court held that the traditional requirements for injunctive relief apply to implied causes of action under § 13(d). The Court then rejected Mosinee's claim that it had suffered the harm necessary to obtain injunctive relief. The Court explained that

> [t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts.

*Id.* at 58 (footnote omitted). Additionally, the Court noted that "none of the evils to which the Williams Act was directed ha[d] occurred or [wa]s threatened in this case," *id.* at 59; Rondeau had not attempted to control the issuer, either by cash tender offer or other device. Finally, the Court also made clear that both the focus of the Williams Act and the private remedies available under the Act were limited:

> Nor are we impressed by respondent's argument that an injunction is necessary to protect the interests of its shareholders who either sold their stock to petitioner at predisclosure prices or would not have invested had they known that a takeover bid was imminent. As observed, the principal object of the Williams Act is *to solve the dilemma of shareholders desiring to respond to a cash tender offer*, and it is not at all clear that the type of "harm" identified by respondent is redressable under its provisions.

*Id.* at 59-60 (citations omitted; emphasis added).

Soon thereafter, the Supreme Court confronted an action instituted under another provision of the Williams Act. In *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1 (1977), the Court addressed whether a tender offeror could institute a cause of action under the Williams Act's anti-fraud provision, U.S.C. § 78n(e).[10] The Court reviewed the legislative history and underlying purpose of the Act. The Court concluded that "[t]he legislative history . . . shows that the sole purpose of the Williams Act was the protection for investors who are

---

[10] 15 U.S.C. § 78n(e) provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

confronted with a tender offer." *Piper*, 430 U.S. at 35. The Court then concluded that, given this legislative purpose, Chris-Craft, a tender offeror competing for control of Piper, could not claim the protections of the anti-fraud provisions of the Act. The Court explained:

> It is clear, therefore, that Chris-Craft has not asserted standing under § 14(e) as a Piper shareholder. The reason is not hard to divine. As a tender offeror actively engaged in competing for Piper stock, Chris-Craft was not in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock. Consequently, Chris-Craft could scarcely have alleged a need for the disclosures mandated by the Williams Act.

*Id.* The Court concluded that "[a]s a party whose previously unregulated conduct was purposefully brought under federal control by the statute, Chris-Craft can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection." *Id.* at 37. Although the *Piper* case concerns private causes of action under § 14(e), as opposed to § 13(d), it is instructive for two reasons. First, *Piper* shows the emphasis that courts should place on discerning congressional intent before recognizing an implied cause of action under the circumstances of a given case. Second, *Piper* reveals the Supreme Court's determination of congressional intent in enacting the Williams Act—to provide stockholders with information when they are "confronted with the decision of whether to tender or retain [their] stock." *Id.* at 35.

Slightly more recently, this court has considered, and explicitly recognized, a private cause of action under § 13(d) in *Indiana National Corp. v. Rich*, 712 F.2d 1180 (7th Cir. 1983). The issue before the court in *Indiana National* was "whether there is an implied private right of action for an issuer

corporation to seek injunctive relief [on behalf of its share-holders] under Section 13(d)." *Id.* at 1181. The defendants in that case were a group of investors who had acquired more than five percent of Indiana National stock and had filed a § 13(d) disclosure, as well as several amendments. Despite these disclosures, an action was initiated by Indiana National, alleging that the disclosures were false and mislead-ing because they failed to reveal the defendants' intention to acquire control. Indiana National sought an order compel-ling the defendants to file an amended Schedule 13D, enjoining the defendants from acquiring more shares of the company, and compelling the defendants to divest them-selves of the shares which had been unlawfully acquired.

To determine whether an implied cause of action should be recognized under these circumstances, we took our cue from the methodology employed by the Supreme Court in Williams Act cases and looked to the legislative history of the Williams Act. We noted that "[t]he purpose of the Williams Act was to insure that public shareholders *facing a tender offer or the acquisition by a third party of a large block of shares possibly involving a contest for control* be armed with adequate information about the qualifications and intentions of the party making the offer or acquiring the shares." *Id.* at 1183 (emphasis added). We also addressed the question of whether the issuer could enforce the provisions on behalf of shareholders. Congress, we noted, did not intend the Williams Act "to protect incumbent management or to discourage takeover bids"; "[i]ts sole purpose was the pro-tection of shareholders." *Id.* at 1185. However, we observed that

> the shareholders have neither the knowledge nor the capacity to ensure that Section 13(d) is enforced and a "fair fight" thus provided. In this respect and for this limited purpose, therefore, the issuer corporation acts on

> the shareholders' behalf in bringing a suit for injunctive relief until an accurate Schedule 13(d) is filed.

*Id.* Having determined that the issuer could institute the action on behalf of its shareholders, we remanded the action to the district court to consider the propriety of injunctive relief.

Our review of these cases provides significant guidance in the interpretive task before us. In exploring the contours of a private cause of action under § 13(d), or other sections of the Williams Act, both this court and the Supreme Court have been guided by congressional intent in enacting the Williams Act: "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau*, 422 U.S. at 58 (citing S. Rep. No. 550, at 2 (1967)); *see also Piper*, 430 U.S. at 28 ("Congress was intent upon regulating takeover bidders, theretofore operating covertly, in order to protect the shareholders of target companies."); *Indiana Nat'l*, 712 F.2d at 1183 ("The purpose of the Williams Act was to insure that public shareholders facing a tender offer or the acquisition by a third party of a large block of shares possibly involving a contest for control be armed with adequate information about the qualifications and intentions of the party making the offer or acquiring the shares."); *Bath Indus.*, 427 F.2d at 109 ("[T]he overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed.").

This purpose not only has informed our general discussion of § 13(d), it has been employed to fashion the scope of the

implied cause of action recognized under § 13(d) and under other sections of the Williams Act. By way of example, the Act's emphasis on acquisition of shares prevented us from recognizing that a "group" could be liable under § 13(d) absent a showing that it had "acquire[d]" additional shares towards an undisclosed purpose. *See Bath Indus.*, 427 F.2d at 109-10. Relying on the Act's purpose of providing information to investors—as opposed to providing management with a weapon to combat takeover bids— the Court held that the traditional standards for gaining injunctive relief applied to a cause of action brought pursuant to § 13(d). *See Rondeau*, 422 U.S. at 58-59. Similarly, it was the purpose of the Williams Act that prevented the Supreme Court from expanding the class of plaintiffs in Williams Act cases to include a competing tender offeror. *Piper*, 430 U.S. at 35.

Finally, we note that, to this point, our Williams Act jurisprudence has been limited to those situations which involved acquisitions or accumulations of stock for the alleged (or actual) purpose of gaining control of the issuer. We have not confronted the question before us today— whether a plaintiff may maintain a cause of action for a violation of § 13(d) absent a tender offer or accumulation of stock for the purpose of controlling the issuer. We turn, therefore, to the question of whether we should recognize a § 13(d) cause of action under the circumstances of this case.

## B.  The Scope of § 13(d) Private Rights of Action

### 1.

The circumstances under which courts can recognize implied rights of action have changed over time. Historically, courts looked to the four factors set forth in *Cort v. Ash*, 422 U.S. 66 (1975), to inform the decision; those factors are:

(1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny such a remedy; (3) whether an implied remedy is consistent with the underlying purposes of the statutory scheme; and (4) whether the cause of action is one traditionally relegated to the states so that it would be inappropriate to infer a federal remedy.

*Mallett v. Wisconsin Div. of Vocational Rehab.*, 130 F.3d 1245 (7th Cir. 1997). However, not long after its decision in *Cort*, the Court made it clear that not all of these factors were of equal value:

It is true that in *Cort v. Ash*, the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent.

*Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76 (1979). Although "the Supreme Court has refused to overrule the *Cort v. Ash* test explicitly, the Court has retreated from it and has focused primarily on legislative intent, the second factor." *Mallett*, 130 F.3d at 1249. Consequently, in determining whether to recognize an implied cause of action under a specific act of Congress, we have identified our inquiry as "whether Congress intended an implied right of action . . . in light of the statute's language, structure, and legislative history. If such inferences of intent are not present, we must

conclude that the essential predicate for implication of a private remedy does not exist." *Id.* (internal quotation marks and citations omitted).

The emphasis on congressional intent as manifested in statutory language is not limited to the initial recognition of an implied right of action. This methodology applies with equal force to expanding the scope of an implied right of action. The Supreme Court has explained that

> [a]ssessing the legitimacy of . . . extension or expansion calls for the application of some fundamental principles governing recognition of a right of action implied by a federal statute, the first of which was not, in fact, the considered focus of the *Borak* opinion. The rule that has emerged in the years since *Borak* . . . came down is that recognition of any private right of action for violating a federal statute must ultimately rest on congressional intent to provide a private remedy, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). From this the corollary follows that the breadth of the right once recognized should not, as a general matter, grow beyond the scope congressionally intended.

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991) (parallel citations omitted). Applying the Court's admonition to the issue presented here, we must ask whether Congress intended the private cause of action for alleged violations of § 13(d) to extend to individual investors who are not faced with a tender offer or some other aggregation of stock for the purpose of controlling the issuer.

### 2.

The parties have very different views concerning Congress' intent in enacting § 13(d). Chinadotcom maintains

that the legislative history of the Williams Act shows that the sole purpose of the Act was the protection of investors confronted by a tender offer. *See Piper*, 430 U.S. at 28. As noted above, this characterization has been oft-repeated by courts that have addressed § 13(d) claims. *See, e.g., Bath Indus.*, 427 F.2d at 109 ("Our review of the legislative history convinces us that the overriding purpose of Congress was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the operation should be managed.").

Mr. Edelson and the Securities and Exchange Commission ("SEC") take a broader view of congressional intent with respect to § 13(d). They acknowledge that the "increase in cash tender offers was the genesis of the Williams Act." SEC Br. at 27. However, they assert that there is nothing in the language of the statute to suggest that § 13(d) is limited only to the tender offer context. Mr. Edelson and the SEC point to the fact that "[t]he statute itself is broadly written and contains no restriction of its coverage to accumulations of stock made as part of a tender offer." SEC Br. at 27. Furthermore, they note that the statute "expressly requires disclosure even where there is no control-purpose or contest for control." *Id.* at 29. They also point to the implementing regulations in support of their position.

The question of the existence—and scope—"of a statutory cause of action is, of course, one of statutory construction." *Touche Ross*, 442 U.S. at 568. We look first, therefore, to the statutory language of § 13(d) to discern whether Congress intended a private cause of action to lie outside of the context of a tender offer or other aggregation of stock. "[I]n determining congressional intent, we look to the particular statutory language at issue, as well as the design of the

statute as a whole." *Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir. 1998) (internal quotation marks and citations omitted).

Our review of § 13(d) leads us to the conclusion that it was designed to provide information to the investor when faced with a tender offer or other accumulation or aggregation of stock that could affect corporate control. Although Mr. Edelson and the SEC are correct that Congress did not employ the term "tender offer" anywhere in § 13(d), the language of the statute does make clear that its focus is the acquisition of securities for the purpose of controlling the issuer. First, the provision's disclosure requirements are triggered by an individual "*acquiring* directly or indirectly the beneficial ownership" of five percent of any class of security. 15 U.S.C. § 78m(d)(1) (emphasis added). When a stockholder reaches the five percent threshold, he must disclose certain information set forth in § 13(d); among the disclosures that must be made is whether "the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities." § 78m(d)(1)(C). However, the statute also provides that the SEC may impose less onerous disclosure requirements if it appears to the SEC that the securities were acquired by an investor "in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer." § 78m(d)(5).

It is clear from this language that Congress was concerned with bringing to light acquisitions of stock by only a specific type of investor. First, Congress only subjects investors to the disclosure requirements if they have acquired a threshold amount of five percent of a class of the issuer's stock—an amount that may allow the stockholder to exert some control over the issuer's actions. Second, the provision allows for a

hierarchy of disclosures—a streamlined version available to the investor who has acquired the stock in the regular course of business and without any intention of affecting the operations of the issuer and a more onerous version applicable to the investor who plans to use his leverage to exert control over the issuer. The first category of investors obviously is of less concern to Congress.

The categories of transactions that Congress excepted from § 13(d) disclosures further reveals Congress' focus on tender offers or other aggregations of stock that may result in a change in control of the issuer. For example, 15 U.S.C. § 78m(d)(6)(B) states that the disclosure requirements shall not apply to "*any acquisition of the beneficial ownership* of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class." (emphasis added). This exception suggests that, although Congress was directing its efforts at acquisitions of stock in general, it was more concerned with acquisitions of large amounts of stock over a short period of time, i.e., a tender offer or the rapid purchase of stocks on the open market for the purpose of gaining control of the issuer.

Congress' textual focus on acquisitions of stock with a control purpose is consistent with the legislative history of § 13(d). As set forth in some detail above, this court, other courts of appeals and the Supreme Court have scoured the legislative history of the Williams Act to discern Congress' intent in enacting § 13(d). Without fail, the courts that have examined the legislative history have arrived at the same conclusion: In enacting § 78m(d), Congress sought to empower the common investor with adequate information regarding those seeking control of an issuer through a tender offer or other method of acquisition so that an individual investor is able to decide whether to retain or dispose of his stock. *See supra* at 17-18. In short, there does not appear to be

any indication in the language of § 13(d) that Congress intended a remedy for individual investors who were not faced with the choice of retaining or disposing of their stock in the face of an imminent change in control.

Despite the emphasis in both the language of the statute and its legislative history on large and rapid acquisitions that may affect control of the issuer, the SEC and Mr. Edelson argue strenuously that Congress intended the private right of action to be available under much broader circumstances.

Mr. Edelson and the SEC argue that Congress must have intended a private cause of action, even in the absence of a tender offer or contest for control, because the statute requires anyone who owns five percent or more of a class of stock to make certain disclosures, regardless of his intent in acquiring the stock. However, the mere fact that Congress decided to regulate a particular activity does not evidence an intent to create a private cause of action to enforce every aspect of that regulatory scheme.[11] It is logical that Congress would want to keep its finger on the pulse of those share-

---

[11] The Supreme Court made this clear in *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979), when it considered whether a private cause of action existed under another section of the Securities Exchange Act that regulated broker-dealers; the Court stated:

> Section 17(a) is like provisions in countless other statutes that simply require certain regulated businesses to keep records and file periodic reports to enable the relevant governmental authorities to perform their regulatory functions. The reports and records provide the regulatory authorities with the necessary information to oversee compliance with and enforce the various statutes and regulations with which they are concerned.

*Id.* at 569.

holders who may, at some point in the future, be in a position to, and actively attempt to, affect the rights of other shareholders. However, until a large shareholder begins acquiring shares for the purpose of controlling the issuer, the rights of other shareholders are not implicated. It is only when control of the issuer is at stake that fellow stockholders are faced with decisions concerning their stock, are in need of the information required by § 13(d) to make those decisions and should have the right to secure that information to protect their investment.

Mr. Edelson and the SEC next point to the language of the implementing regulations on Schedule 13D as authority for their position. *See* SEC Br. at 22. However, we cannot look at the implementing regulations with the same authority as we do statutory language and legislative history in discerning whether Congress intended to recognize a private cause of action under the facts of this case; "the language of the statute and not the rules must control." *Touche Ross*, 442 U.S. at 577 n.18 (rejecting argument that the rules adopted pursuant to an act of Congress can "provide the source of an implied remedy" when the statute itself cannot).

Finally, we cannot accept the view of the SEC and of Mr. Edelson that there is case law to support their view of § 13(d)'s purpose. Neither Mr. Edelson nor the SEC has pointed to a single case that has recognized a § 13(d) action in the absence of some accumulation or aggregation of stock, or other contest for control.[12] Thus, Mr. Edelson and the SEC

---

[12] The SEC cites four cases in support of its argument that § 13(d) private causes of action should not be limited to tender offers or other contests for control. None of these cases support its claim. *See Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 713 (5th Cir. 1984) (involving rapid acquisition of stock to attain a

(continued...)

have not dissuaded us from the conclusion that a private cause of action pursuant to § 13(d) arises only in the context of a tender offer or aggregation of shares for the purpose of controlling the issuer.

## C. Application

Having concluded that Congress intended to recognize a private cause of action under § 13(d) only in the context of a tender offer or other contest for control, our disposition of Mr. Edelson's claim is straightforward. Mr. Yip's action in voting against Mr. Edelson simply is not the type of activity which Congress intended to regulate through private enforcement under § 13(d).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

---

[12] (...continued)

"blocking position" to any defensive efforts by the issuer); *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 365-66 (2d Cir. 1980) (addressing alleged failure to disclose a purpose to control when shareholder had acquired in excess of one-third of the outstanding stock of the issuer); *Chromalloy American Corp. v. Sun Chem. Corp.*, 611 F.2d 240, 243-44 (8th Cir. 1979) (involving acquisition of more than ten percent of the outstanding stock without disclosing a control purpose); *Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 96 (1st Cir. 1977) (considering § 13(d) liability of group of shareholders that collectively had acquired nearly fifteen percent of the outstanding stock of the issuer).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*